JAMES J. STERANKO *vs.* INFOREX, INC.
(and two companion cases[1]).

Middlesex.  Suffolk.  April 16, 1976. — April 29, 1977.

Present: KEVILLE, GOODMAN, & ARMSTRONG, JJ.

Contract, Employment, Performance and breach, Waiver. *Invention.* Damages, Breach of employment contract. *Unlawful Interference.*

In an action for breach of an employment agreement which provided that "[t]he term of the Employee's employment hereunder shall be for 18 months . . . and for such additional periods as may be mutually acceptable," evidence that after the expiration of the eighteen-month period the employee continued to work at the same

---

[1] The second case is Inforex, Inc. *vs.* James J. Steranko and State Street Bank and Trust Co. (Steranko filed a counterclaim to this action in which International Business Machines Corp. [IBM] and Infobond Corp. [Infobond] were joined as third-party defendants. The counterclaim was dismissed against IBM pursuant to a stipulation of the parties. Infobond appealed from an interlocutory decree overruling its demurrer to Steranko's amended complaint. However, that appeal has not been argued before this court, nor did the judgment entered in the Superior Court make reference to Infobond.) The third case is that of James J. Steranko *vs.* Thomas B. Horgan, State Street Bank and Trust Company and Inforex, Inc.

annual salary without diminution in his responsibilities warranted a finding that the agreement had been renewed on a year to year basis. [260-262]

In an action for breach of an employment agreement, evidence that the employee's executive responsibilities had been gradually withdrawn by his employer until he no longer held an executive position warranted a finding that the employer had breached the agreement [262-263]; the fact that the employee continued to work in a nonexecutive capacity did not constitute a waiver of the breach where the employee's demotion was gradual and where he brought this action soon after he learned that he had not been reelected vice president [263-265].

An employer's breach of an employment agreement, which also contained provisions for purchasing stock, vitiated the agreement's restrictions on selling the stock. [266-267]

An employer's breach of an employment and stock purchase agreement entitled the employee to recover damages for the employer's wrongful refusal to authorize release of the agreement's restrictions on the sale of stock. [267-268]

Termination of an employment agreement because of the employer's breach did not relieve the employee of his obligation to assign to the employer his rights in a patent application for an item invented as one of the employee's major responsibilities in his employment. [268-270]

Where an employee continued to work for an employer after the employer breached their employment agreement until he was discharged for cause, the employee was not entitled to recover damages for the remainder of the term under the agreement. [270-271]

Under an employee stock restriction agreement which provided that the employer was entitled to repurchase shares at a certain price if the employee were discharged for cause, the employer was entitled to recover damages for the employee's refusal to return his shares after his discharge. [271-272]

Evidence in an action against a corporate officer for intentional interference with an employee's contractual relationship with the corporation warranted a finding that the officer's actions were not a result of malevolence or malice. [272-273]

A bank acting as transfer agent was not liable to the plaintiff for its refusal to issue unrestricted stock certificates where its refusal to remove restrictive legends from the plaintiff's shares did not constitute a refusal to "register a transfer" within the meaning of G. L. c. 106, § 8-401(2). [273-275]

Two BILLS in equity filed in the Superior Court on June 16, 1971, and December 9, 1971, respectively.

CONTRACT.  Writ in the same court dated November 21, 1973.

The cases were tried before *Mitchell, J.*

*Edward R. Lev* for James J. Steranko.

*Evan Y. Semerjian* for Inforex, Inc. & others.

KEVILLE, J.   These are three cases which come here on appeals and cross appeals from judgments entered in litigation resulting from disputes with respect to written agreements between an employer and one of its employees. The cases were consolidated for trial before a Superior Court judge sitting without jury. We have before us a transcript of the evidence, numerous exhibits and the judge's findings, rulings and order for judgment. The judgments were entered after July 1, 1974. We are to give due weight to the findings of the judge which will not be reversed unless clearly erroneous but we may find facts in addition to those found by him. *Taylor* v. *Lassell*, 4 Mass. App. Ct. 539, 540 (1976).

We summarize pertinent facts as follows: On July 15, 1968, James J. Steranko (Steranko), a computer processing and packaging engineer, and Inforex, Inc. (Inforex), a corporation engaged in the design, development, manufacture and marketing of peripheral equipment for computers, entered into an employment and stock purchase agreement (employment agreement) and a stockholders' agreement. The employment agreement provided that Steranko was to be employed by Inforex in an executive capacity throughout the term of his employment under the agreement. The term was to be for eighteen months commencing on July 8, 1968, and "for such additional periods as may be mutually acceptable." His starting salary of $26,000 per annum remained unchanged during the course of his employment. The employment agreement also embodied provisions concerning discharge for cause, assignment of patent rights, and participation in company incentive plans.

Pursuant to the employment agreement Steranko purchased 8,000 shares of Inforex common stock at a dollar a share. These shares were subject to the restriction that they were not to be sold, pledged or transferred for five years following the date of the agreement. Furthermore, subject to certain exceptions, the employment agreement gave Inforex an option to repurchase Steranko's shares

within the five-year period at a price of a dollar a share.[2][3]

Section 12 of the employment agreement, which contained restrictions on Steranko's right to sell his stock and the provisions for repurchase by Inforex, was amended on October 21, 1968, and again on December 22, 1969. These amendments dealt with the right of Inforex to repurchase Steranko's shares. The first amendment made clear that Inforex would not have the right to repurchase Steranko's shares if he were discharged without cause or if Inforex failed to renew the agreement on substantially the same terms. The second amendment deleted the latter provision.

Steranko was first employed in an executive capacity as required by the employment agreement and held the title of vice president of manufacturing until May 19, 1971. At the outset, his duties included responsibility for manufac-

---

[2] A four-for-one split in April, 1969, increased the number of shares held by Steranko to 32,000. On May 16, 1969, Inforex released 8,000 of these shares from the resale restrictions. On June 23, 1969, Steranko purchased another 2,000 shares subject to similar restrictions set out in an "Employee Stock Restriction Agreement," except that the repurchase price for these shares was twenty-five cents a share. Thus Steranko's total acquisition was 34,000 shares of which 26,000 were restricted when this dispute arose.

[3] Section 12 of the employment agreement provided, inter alia, "If, prior to the expiration of said five-year period, the Employee shall leave the employ of the Company for any reason, including without limitation any termination of this Agreement by the Company . . . but specifically excluding the death or permanent . . . disability of the Employee attested by competent medical evidence, the Company shall have an option exercisable within sixty days after the severance of such employment to purchase any or all shares of the Stock for a purchase price of $1 per share. . . . All certificates representing shares of the Stock shall bear a legend referring to the restrictions on the transfer and disposition of the Stock and the Company's option to repurchase the Stock set forth in this Section 12."

The stockholders' agreement provided that if Steranko received a written offer from a third party to purchase his stock, Inforex would have an option to match the offer and repurchase the shares. That agreement was to be in effect for three years, until July 15, 1971. In light of the employment agreement which barred Steranko from selling or transferring his stock for five years, as long as the employment agreement remained in effect the stockholders' agreement became ineffectual by the passage of time in the course of this dispute.

turing and for the development of a packaging system for Inforex's products. At that time other employees reported to him and he was assigned office space comparable to that of other officers of the company. During his employment at Inforex, Steranko was instrumental in the development of the Infobond process. He invented or participated in the invention of three items designated by Inforex as M-258, M-266 and M-297.[4] In 1969 Steranko assigned to Inforex his rights to the inventions, M-258 and M-266. His failure to assign his rights to M-297 will be discussed later in the opinion.

Beginning in the summer of 1970 and continuing into the winter of that year, proposals were made by Inforex to Steranko that he leave Inforex and become an employee of the proposed Infobond corporation (Infobond). It was suggested that he surrender some of his Inforex stock in exchange for Infobond stock. He regarded these proposals as unfair and he rejected them because he believed that the stock to be surrendered was worth much more than the Infobond shares he would receive in return.

On September 22, 1970, Steranko was assigned to work full time on corporate planning for the proposed Infobond corporation which was organized in 1971 to exploit the Infobond process commercially. At that time another employee was placed in charge of manufacturing. As a consequence, after September 22, 1970, Steranko no longer retained his previous manufacturing responsibilities. He thereafter attended no officers' meetings and employees no longer reported to him. In November, 1970, Thomas B. Horgan (Horgan), the president of Inforex, offered Steranko a staff position in "product assurance." This position was without executive responsibility and Steranko rejected the offer. Also in November, 1970, certain Inforex employees had some of their shares of stock released from

---

[4] The Infobond process is an automated wiring process for connecting electronic components on a printed circuit board. The process makes use of the M-258, M-266 and M-297 inventions.

the resale restrictions. Steranko was the only officer whose stock was not released from these restrictions.

On December 17, 1970, Steranko was assigned the position of consultant to the president-designate of Infobond. Steranko was informed that he was no longer authorized to make purchase or employment commitments for Inforex. Nor was he authorized to engage in business negotiations on Infobond's behalf. The position was without executive responsibility and thereafter Steranko was not employed in an executive capacity. He entered upon and performed the duties which were then assigned to him.

Thereafter, his offices were moved twice. The new offices were interior offices and were smaller and less desirable than those assigned to other Inforex officers. These moves were accompanied by decreased secretarial services. On May 19, 1971, Steranko was not reelected as a vice president of Inforex. On June 16, 1971, he brought a bill for declaratory relief in the Superior Court (the first of the cases now before us) alleging that Inforex had breached the employment agreement by demoting him and had constructively discharged him without cause. This bill sought a determination whether the employment agreement continued to be binding upon the parties.

After bringing the bill, Steranko remained at his job until he was discharged in November, 1971. The invention designated M-297 was found by the judge to have been in commercial use by Inforex in the spring of 1970. On January 22, 1971, Steranko and a coinventor had executed a power of attorney authorizing Inforex to prosecute the patent application for that invention in the United States Patent Office. Thereafter, despite requests made to him by Inforex, he did not assign to the company his rights in the patent application. And, on November 5, 1971, he refused to execute the assignment, stating that his obligation to do so depended upon the validity of the employment agreement which was then the subject of pending litigation (his bill for declaratory relief).

On November 22, 1971, the board of directors of Inforex, citing Steranko's refusal to execute the M-297 assignment,

voted unanimously to discharge him for cause.[5] Inforex then informed Steranko of its intention, pursuant to section 12 of the employment agreement and the stockholders' agreement, to exercise its option on November 29, 1971, to repurchase his 26,000 restricted shares of Inforex stock at cost. When he refused to resell the stock, Inforex brought suit in December, 1971, (the second case now before us) seeking the return of the stock, the assignment of Steranko's patent rights to M-297 and various restraining orders.[6]

On January 5, 1972, Steranko made a written demand upon Inforex and State Street Bank and Trust Company (bank) to issue certificates for 22,200 of his shares without a section 12 legend restricting their sale. On instructions from Inforex, the bank declined to issue the certificates as requested. On November 21, 1973, Steranko brought an action (the third of the cases now before us) seeking, inter alia, damages for Inforex's and the bank's refusals to issue certificates without restrictions and for damages against Horgan for maliciously causing Inforex to breach the employment agreement and for causing Inforex and the bank to refuse to issue the certificates.

The cases, as stated above, were consolidated for trial; and on January 31, 1975, the judge entered findings, rulings and order for judgment. Thereafter, identical judgments were entered in the three cases.[7]

---

[5] Horgan, the president of Inforex, testified that Steranko's refusal to assign his patent rights to M-297 was the sole reason for his discharge.

[6] Inforex obtained an order restraining Steranko and the State Street Bank and Trust Company, the transfer agent for the stock, from disposing of or transferring any shares of Inforex stock issued to Steranko. This order was later modified and then dissolved when Inforex failed to post a bond.

[7] "1. That the Employment Agreement aforementioned be declared valid and in full force and effect in its entirety from July 15, 1968 through January 7, 1970. [The judgment omitted the additional language of the judge's finding and ruling numbered 39 as follows: "and from year to year thereafter."]

"2. That James J. Steranko assign to Inforex all his right, title and interest in M-297.

"3. That James J. Steranko be declared the owner of the 26,000 In-

*Choice of Law.*

In section 15 of the employment agreement, the parties provided that the agreement should "be construed under and governed by the laws of the State of New York." Section 7 of the stockholders' agreement contained a similar provision. Where the parties have expressed a specific intent as to the governing law, Massachusetts courts will uphold the parties' choice as long as the result is not contrary to public policy (compare *Dolan* v. *Mutual Reserve Fund Life Assn.* 173 Mass. 197 [1899]) and as long as the designated State has some substantial relation to the contract. See *Mittenthal* v. *Mascagni,* 183 Mass. 19, 22 (1903); *Maxwell Shapiro Woolen Co. Inc.* v. *Amerotron Corp.* 339 Mass. 252, 257-258 (1959); *Quintin Vespa Co. Inc.* v. *Construction Serv. Co.* 343 Mass. 547, 552, n.5 (1962). See Scoles, Goodrich's Conflict of Laws § 107 (4th ed. 1964); Fine, Massachusetts Contract Cases and Problems in the Choice of Law, 43 Mass. L. Q. 46, 47-50, 54, n.55 (Oct. 1958); Restatement (Second) of Conflict of Laws § 187 (1971). As neither party has argued that application of New York law would violate Massachusetts public policy or that New York lacks substantial relation to the contract we shall interpret the agreements according to the law of that State.

*Term of Employment.*

In section 1 of the employment agreement, Inforex agreed to employ Steranko in an executive capacity throughout his term of employment. Section 4 provided in part that "[t]he term of the Employee's employment hereunder shall be for 18 months commencing on July 8,

---

forex shares here in issue free of any and all restrictions imposed thereon pursuant to and in accordance with the Employment Agreement of July 15, 1968, the Stockholders' Agreement of July 15, 1968, and the Employee Stock Restriction Agreement of June 23, 1969.

"4. That Inforex and/or the Bank remove from the aforesaid 26,000 shares any and all such restrictions and transfer said shares free and clear of these restrictions to James J. Steranko forthwith.

"5. That James J. Steranko recover of Inforex the sum of $3,500.00 with interest thereon as provided by law.

"6. No costs of action."

1968, and for such additional periods as may be mutually acceptable." Inforex contends that Steranko's "term of employment" expired on January 8, 1970, that thereafter it was no longer obligated to employ him in an executive capacity and, consequently, that his reassignment in December, 1970, to a nonexecutive position did not constitute a breach of contract. In our view the judge correctly ruled "that the Employment Agreement continued and was in effect in its entirety from July 15, 1968 through January 7, 1970, and from year to year thereafter."

After the expiration of the eighteen-month period on January 8, 1970, Steranko continued to work for Inforex at the same annual salary without diminution in his responsibilities. In the spring of 1970, with the approval of Horgan, Steranko became responsible for quality control for Inforex. Significantly, he was not informed either orally or in writing that his contract would not be, or had not been, renewed. Nor did Inforex seek, pursuant to section 12 of the employment agreement, to repurchase any of Steranko's stock within sixty days of January 8, 1970.

When one has been employed for a definite period at an annual wage and continues in the same position after the expiration of the term, there is a presumption of a continuance of the employment relationship for another year upon the same terms. *Adams* v. *Fitzpatrick,* 125 N.Y. 124, 129 (1891). *Mason* v. *New York Produce Exch.* 127 App. Div. 282, 285 (1908), affd. 196 N.Y. 548 (1909). *Pohlers* v. *Exeter Mfg. Co.* 52 N.Y.S. 2d 316 (N.Y. City Ct. 1944). A continuance on a year to year basis may result even where the original term was for a period other than one year. See *Carter* v. *Bradlee,* 245 App. Div. 49 (1935), affd. 269 N.Y. 664 (1936) (two years); *Shenn* v. *Fair-Tex Mills, Inc.* 26 App. Div. 2d 282, 283 (N.Y. 1966) (fourteen months); *Schlaifer* v. *Kaiser,* 84 Misc. 2d 817 (Sup. Ct. 1975), affd. 50 App. Div. 2d 749 (N.Y. 1976) (two years).

The rule has been expressed as follows: "The general rule is that where one enters the employment of another for a fixed period at a stated annual salary, and the employment continues beyond that period, the presumption

is continuance of the relations for another year at the same salary." *Shenn* v. *Fair-Tex Mills, Inc. supra,* at 283. As we have already observed, the employment agreement specified a term of employment for eighteen months and for such additional periods as the parties found acceptable. Since the evidence shows that Steranko continued to be employed by Inforex without objection beyond the term set forth in the employment agreement, we conclude from the conduct of the parties that a renewal on a year to year basis occurred.[8] *Shenn* v. *Fair-Tex Mills, Inc. supra.* Contrast *Foster* v. *White,* 253 App. Div. 448, 451, revd. 279 N.Y. 38 (1938).[9]

*Breach and Waiver.*

Inforex argues alternatively that it did not breach its contract with Steranko, but even if it did, Steranko waived the breach by continuing to work for Inforex and later for Infobond in a nonexecutive capacity. Inforex further contends that by waiving its breach Steranko not only lost any rights he might have had to the removal of the restrictions on his stock but that he continued to be obliged to assign his patent rights to M-297 under the employment agreement.

The evidence, which generally supports the subsidiary findings of the judge, makes clear that Steranko's demotion from his position of vice president with executive responsibilities was a gradual one leading to a breach of the

---

[8] Inforex argues in effect that the term of employment cannot be renewed or extended by the conduct of the parties because section 17 of the employment agreement states that "[t]his Agreement may be amended, terminated or superseded only by an agreement in writing between the Company and the Employee." We hold, however, that a renewal or an extension is beyond the scope of section 17 and therefore need not be in writing.

[9] Cases relied upon by Inforex are distinguishable. *Van Der Veer* v. *Theile,* 185 App. Div. 17 (N.Y. 1918), involved employment for an indefinite period with a qualified promise to guarantee employment for a year. *Klein Inst. for Aptitude Testing, Inc.* v. *Kestin,* 34 Misc. 2d 967 (N.Y. Sup. Ct. 1962), dealt with a contract providing for termination at will after a one-year period. However, the case arose on a motion to dismiss the complaint for legal insufficiency on its face, and did not confront the question whether the facts demonstrated a renewal of the employment agreement.

employment agreement by Inforex. The process of attrition to which he was subjected commenced as early as September, 1970, when he was relieved of his manufacturing responsibilities and assigned to work on corporate planning for the embryonic Infobond corporation. That process was exacerbated in December, 1970, by his assignment to the position of consultant for Infobond without executive responsibilities and culminated on May 19, 1971, when he was not reelected as vice president of Inforex.

A material change in an employee's duties or a significant reduction in rank may constitute a breach of contract entitling the employee to damages. *Marks* v. *Cowdin,* 226 N.Y. 138, 146-147 (1919). *Karas* v. *H.R. Labs., Inc.* 271 App. Div. 530, 534 (1946), affd. 297 N.Y. 494 (1947). *Ingrassia* v. *Shell Oil Co.* 394 F. Supp. 875, 886 (S.D.N.Y. 1975). Contrast *Molinar* v. *Western Elec. Co.* 525 F. 2d 521, 528 (1st Cir. 1975), cert. den. 424 U.S. 978 (1976). "If an employee, a fortiori an executive employee, is engaged to fill a particular position, any material change in his duties, or significant reduction in rank, may constitute a breach of his employment agreement . . .. As a necessary corollary, acts done by the employee in defense of his contract rights, or in assertion of an agreed status or function in the enterprise, are not insubordination." *Rudman* v. *Cowles Communications, Inc.* 30 N.Y. 2d 1, 10 (1972). Certainly by May 19, 1971, when he ceased to be an officer of the corporation, Steranko was warranted in treating the employment agreement as having been breached by Inforex. That event gave rise to his petition for declaratory relief which he brought less than a month thereafter.

Waiver of breach is an established concept in New York and in contract law generally. *Alden Speare's Sons Co.* v. *Casein Co. of America,* 122 App. Div. 22, 25-26 (N.Y. 1907). *Ferguson Contracting Co.* v. *State,* 202 App. Div. 27 (1922), affd. 237 N.Y. 186 (1923). *Thuman* v. *Clawson & Wilson Co.* 211 App. Div. 507 (N.Y. 1925). Williston, Contracts § 688 (3d ed. 1961). However, on the facts presented here, we do not find that Steranko waived the breach by Inforex. In contrast to the New York cases cited

by Inforex in which the injured party continued to perform after definitive breaches of commercial contracts (*Alden, supra; Ferguson, supra; Thuman, supra*), it is clear that Inforex withdrew Steranko's executive responsibilities and perquisites in bits and pieces.[10] Because of the piecemeal nature of his demotion and the ambiguity of the contractual term "executive position," it was difficult for Steranko to realize with certainty at any point during late 1970 and early 1971 that his contract had been breached. But when he learned in May, 1971, that he had not been reelected vice president, a solid indication that he no longer retained an executive position with Inforex, he proceeded without delay to file suit for a declaration of his rights under the employment agreement. This course was consistent with the tenuous position which he had been obliged to assume. His resort to litigation evidenced a challenge to the change in status which Inforex had imposed upon him (compare *United Autographic Register Co.* v. *Wight,* 272 F. 545, 551 [8th Cir. 1921]) without jeopardizing his valuable but threatened ownership of company stock.[11]

---

[10] The judge found that in September, 1970, when Steranko was assigned to work full time on corporate planning for the proposed Infobond Company, he retained none of his previous manufacturing responsibilities, had no employees reporting to him, and no longer attended officers' meetings. According to the judge, the breach occurred in December, 1970, when Steranko was assigned as consultant to the president of Infobond. The judge found that further degradations in Steranko's position occurred after December, 1970: his assignment to less desirable office space, his decreased secretarial services and, eventually, the denial of his reelection as vice president.

[11] Had he quit, Steranko would have been faced with a dual problem. Not only would it have been his burden to show that he had been constructively discharged prior to his resignation by virtue of the change in his duties in violation of the employment agreement (see *Karas* v. *H.R. Labs., Inc.* 271 App. Div. 530 [N.Y. 1946]; cf. *Merrill* v. *Wakefield Rattan Co.* 1 App. Div. 118 [N.Y. 1896]; *Levitz* v. *Robbins Music Corp.* 6 App. Div. 2d 1027 [N.Y. 1958]; *Laiken* v. *American Bank & Trust Co.* 34 App. Div. 2d 514 [N.Y. 1970]; contrast *Molinar* v. *Western Elec. Co.* 525 F. 2d 521, 527 [1st Cir. 1975]), but he would have faced as well the possibility that the court would find the stock limitation provisions of his contract to be severable and thus divest him of the stock despite the breach by Inforex.

The decision of the New York Court of Appeals in *Rudman* v. *Cowles Communications, Inc., supra,* reinforces our conclusion. In *Rudman,* the following took place: In September, 1966, Rudman, after having sold his publishing company to Cowles in exchange for stock, employment in a senior executive position with Cowles and the responsibility of preparing the same kind of textbooks which his company had been publishing, discovered that a large staff in Cowles' central office was heavily revising books which he had written. He objected and met with senior Cowles executives to discuss his position. In late September and early October, he refused to accept the organizational chain of command imposed by Cowles which relegated him to an intermediate executive level. However, on October 30, he moved from his old offices in which he had been preparing textbooks to Cowles' central office, but he was given no real duties or staff. He refused to accept instructions from junior Cowles' executives who had been ranked above him on the company's organizational chart. On December 14, he restated his claim to his promised role in the company. On January 12, four months after he first learned of his diminished role, he was discharged.

The court, in holding for Rudman on the question of wrongful discharge, did not discuss the question whether Rudman had waived his right to claim breach of contract by not resigning when first confronted with his altered status in the corporation. But, the court held that Cowles could not put Rudman "into a state of 'deep-freeze' until he was provoked into such gross disobedience of 'orders' that a discharge for insubordination would be plausible." *Id.* at 12. We find Steranko's situation to be analogous to that of Rudman. Steranko's conduct in the course of his gradual demotion from his executive status consisted, as did Rudman's, of both acquiescence and protest. The position into which he was maneuvered by his employer was untenable and in our view, by bringing his bill for declaratory relief in June, 1971, he adequately asserted his right to sue for breach.

*Severability.*

The judge found and ruled that the restrictions on stock transfer in section 12 of the employment agreement remained in effect until July 15, 1973, despite his earlier finding and ruling that the demotion of Steranko constituted a breach of contract by Inforex. The judge, however, did not disclose his reasons for concluding that the restrictions continued after the demotion. He made no mention, for example, of the argument of Inforex that the section 12 restrictions were severable from the rest of the agreement (and thus remained unaltered by the company's breach) by virtue of section 14, which states: "In case any one or more of the provisions of this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and unenforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby."

We hold that the judge's conclusion was error. We find it hardly credible that a provision like section 14, which protects the remaining clauses of a contract when one clause is declared illegal or unenforceable, can also serve to shield a clause such as section 12 when the contract as a whole has been breached.

Inforex argues that one purpose of the section 12 restrictions was to avoid giving employees who were discharged without cause an unfair advantage over employees who were not discharged but who might have wanted to change jobs but for the stock restrictions. That argument, however, ignores the fact that an employee such as Steranko, who was deprived of the benefit of his bargain (i.e., an executive position), *should* be treated differently from an employee who was merely unhappy with his job. The construction urged upon us by Inforex would place one in Steranko's position totally at the whim of the company because the company could arbitrarily abrogate his contract rights by demoting him and still enforce the stock restrictions. An executive whose stock had increased in value could be coerced into accepting either a position inferior to his contractual guarantee or quitting and for-

feiting his valuable stock. The courts of New York have sought to avoid construing contracts in a way "that would place one of the parties at the mercy of the other." *Carter* v. *Bradlee*, 245 App. Div. at 50 (interpreting a clause in a term employment contract allowing employer to dismiss employee for any reason to require a "reasonable ground"). See *Rafe* v. *Hindin*, 29 App. Div. 2d 481, 484, 485, affd. 23 N.Y. 2d 759 (1968); *Crane* v. *Perfect Film & Chem. Corp.* 38 App. Div. 2d 288, 291 (1972), affd. sub nom. *Crane* v. *Cadence Indus. Inc.* 32 N.Y. 2d 718 (1973); *Sinkoff Beverage Co. Inc.* v. *Joseph Schlitz Brewing Co.* 51 Misc. 2d 446, 448 (N.Y. Sup. Ct. 1966); *Levey* v. *Saphier*, 83 Misc. 2d 146, 147 (N.Y. Sup. Ct. 1975).

Consequently, we hold that the breach of the employment agreement by Inforex vitiated the restrictions under section 12 on 24,000 shares of Steranko's stock and entitled him to have the restrictive legends removed from his certificates.[12] We hold, however, that the restrictions on Steranko's remaining 2,000 shares imposed by the employee stock restriction agreement (see n.2, *supra*) were not part of the employment agreement and thus remained in effect until July 8, 1973, despite the breach.

*Damages.*

Having concluded that the breach by Inforex entitled Steranko to have the restrictions on 24,000 shares of his stock removed, a further question is whether he is entitled as well to damages for the decline in value of the stock. Under New York law Steranko is entitled to both specific performance and damages for Inforex's wrongful refusal to authorize release of the restrictions. *Riskin* v. *National Computer Analysts, Inc.* 62 Misc. 2d 605, 609 (Sup. Ct. 1970), modified, 37 App. Div. 2d 952 (N.Y. 1971). Contra, *Thornburg* v. *Homestead Minerals Corp.* 32 Colo. App. 299, 301 (1973), affd. 184 Colo. 141 (1974). The measure

---

[12] We need not discuss whether the stock restrictions contained in the shareholders' agreement were severable from the terms of the employment agreement because the shareholders' agreement restrictions expired by their own terms on July 15, 1971, prior to Steranko's formal written demand that the restrictions be removed.

of damages is the difference between the market price at the time of Inforex's wrongful refusal, or within such reasonable time thereafter as Steranko might have sold the stock, and the market price at the time of the trial.[13] *Riskin,* 62 Misc. 2d at 609, 37 App. Div. 2d at 952.

Here Steranko sent a written demand to Inforex and the bank to issue certificates without transfer restrictions on January 5, 1972, for 22,200 shares. On January 7, 1972, Inforex advised Steranko that it had instructed the bank to refuse his demand. Thus under New York law, Steranko was entitled to the highest interim value of the 22,200 shares of the stock between January 7, 1972, and a reasonable time thereafter, less the value of the stock at the time of trial.[14] Where the essential facts of the refusal to release the restrictions are undisputed, what constitutes a reasonable time is a question of law for the judge. *Colt* v. *Owens,* 90 N.Y. 368, 371 (1882). *Wright* v. *Bank of the Metropolis,* 110 N.Y. 237, 249 (1888). See *Mayer* v. *Monzo,* 221 N.Y. 442, 446-447 (1917); Annot. 31 A.L.R. 3d 1332-1334 (1970). We leave it to the trial court to determine the damages under the formula we have described.

*Steranko's M-297 Patent Rights.*

Having found no "unclean hands" on the part of the corporation which would have barred specific performance under section 7 of the employment agreement, the judge

[13] The trial judge ruled that Steranko was not entitled to any damages because the judge disbelieved Steranko's testimony that he would have sold the stock if the restrictions on the shares had been removed by July 15, 1973, the date on which the judge erroneously held the restrictions to have expired. (See p. 266, *supra.*) Also the judge's finding that Steranko would not have sold his stock prior to July, 1973 (assuming that finding to be relevant to the issue of damages), was clearly erroneous. Steranko's attempts to have the restrictions on transfer removed, his obtaining of a "no action" letter from the Securities and Exchange Commission to facilitate a transfer, his sales in December, 1971, and January, 1972, of 6,500 shares which had earlier been released, and his testimony that after his discharge he needed capital for a new business venture are compelling evidence that Steranko would have sold the stock had the restrictions been removed.

[14] Since it does not appear from the record that Steranko ever formally demanded release of the restrictions on the remainder of his shares, he is limited to damages on 22,200 shares.

ordered Steranko to assign his M-297 patent rights to Inforex. However, in our view, the employment agreement was no longer in force when in November, 1971, Steranko refused to execute the assignment. Steranko's action for a declaration of his rights under the employment agreement brought in June, 1971, following his demotion in May, indicated his awareness that Inforex had breached the agreement, his desire to rescind that agreement and to be relieved from its terms.

As Steranko has asserted, because of the uncertain status of his rights and obligations under the stock restriction clauses, he continued in the employ of Inforex-Infobond in a nonexecutive capacity to protect his rights to the stock. We find that after May 19, 1971, his employment was no longer governed by the employment agreement but was on an at will basis. See *Linscott* v. *Millers Falls Co.* 316 F. Supp. 1369, 1373 (D. Mass. 1970), affd. 440 F. 2d 14 (1st Cir.), cert. den. 404 U.S. 872 (1971).

However, the termination of the employment agreement did not automatically relieve Steranko of his obligation to assign his rights to M-297. The law of this jurisdiction recognizes that even in the absence of specific contract provisions an employer may be entitled to the inventions of employees hired to direct or to engage in inventive research. *Hoyt* v. *Corporon,* 268 Mass. 544, 548 (1929). *National Dev. Co.* v. *Gray,* 316 Mass. 240, 247 (1944). See *BBF Group, Inc.* v. *Kontrols, Inc.* 3 Mass. App. Ct. 735 (1975). While an employee, who was hired in a general capacity, may retain title to inventions developed while in another's employ, if he was either hired as an inventor or directed during the course of his employment to develop or perfect new or existing machinery or processes, his employer becomes the owner of resulting inventions and may compel the assignment of patents taken in the employee's name. See *Hoyt, supra,* at 548-549. *National Dev. Co. supra.*[15] In electing to continue on an at

---

[15] Since New York law applies in this case only to the employment agreement and the stockholders' agreement between Steranko and

will basis, Steranko remained obligated to make the assignment of his M-297 patent rights not under the agreement but under common law master-servant principles, since the development of the Infobond process of which M-297 was a part was one of his major responsibilities.[16]

*Damages for Lost Salary.*

The judge found and ruled that since Steranko was not discharged in November, 1971, for cause, as defined in the employment agreement, he was entitled to $3,500, the salary which he would have earned had his employment continued for the balance of the term under the agreement. The measure of damages for breach of contract being a substantive rather than a procedural matter, its determination is also governed by the law of New York. See *Atwood* v. *Walker*, 179 Mass. 514, 518-519 (1901).

As we have already observed, the breach of the employment agreement by Inforex was a gradual process culminating in the decision on May 19, 1971, not to reappoint Steranko vice president. The breach at that point entitled him to damages measured by the remainder of his salary through January 7, 1972, subject to an "active duty of making reasonable exertions to render the injury as light as possible." *Hamilton* v. *McPherson*, 28 N.Y. 72, 77 (1863). *Wilmot* v. *State*, 32 N.Y. 2d 164, 168 (1973).

Had he resigned in May or June, 1971, he would still have been obligated to seek other employment to mitigate damages. He could not sit idly by with the expectation of collecting his salary for the remainder of the term governed by the agreement. *McClelland* v. *Climax Hosiery Mills*, 252 N.Y. 347, 358-359 (1930) (Cardozo, C.J., con-

---

Inforex, Massachusetts law governs the resolution of an employer's common law rights to inventions of his employees. New York law, however, would appear to compel the same result. *Annin* v. *Wren,* 8 N.Y. St. Rep. 852 (Sup. Ct. 1887). *Cahill* v. *Regan,* 5 N.Y. 2d 292, 296 (1959).

[16] Cf. *Jamesbury Corp.* v. *Worcester Valve Co. Inc.* 443 F. 2d 205, 214 (1st Cir. 1971), which holds that common law principles are superseded when inventive rights are allocated by contract. But here, following Inforex's breach, when Steranko continued to work on an at will basis, common law principles became applicable.

curring). *Beggs* v. *Dougherty Overseas, Inc.* 287 F. 2d 80, 83 (2d Cir. 1961).

Although he was neither obliged to accept reemployment from Inforex in a lesser capacity (22 Am. Jur. 2d, Damages § 72, [1965]; Annot. 44 A.L.R. 3d 629, 636 [1972]) nor to continue in his original position under degrading circumstances (*Teich* v. *Aetna Indus. Corp.* 8 N.Y. 2d 766, 767 [1960]), Steranko elected to continue to work for Inforex-Infobond in a nonexecutive capacity following the breach. As stated earlier, under common law principles, Inforex was entitled to the assignment of Steranko's M-297 patent rights and upon his refusal to assign them, his discharge by Inforex was warranted. Therefore, he may not successfully argue now that he is entitled to damages for lost salary.[17] "[H]e will not be heard to say that the loss of wages from then on shall be deemed the jural consequence of the earlier discharge. He has broken the chain of causation, and loss resulting to him thereafter is suffered under his own act." *McClelland, supra,* at 359. We conclude that because Steranko failed in his duty to mitigate damages the judge's award of $3,500 was error.

*Damages for Inforex.*

As stated earlier, 2,000 of Steranko's shares which were not part of the employment agreement remained restricted until July 8, 1973, despite the breach of contract by In-

---

[17] In view of our conclusion that the employment agreement terminated upon Steranko's not being reelected vice president in May, 1971, the finding and ruling of the judge (numbered 41) that Steranko's discharge in November was not for "cause," as defined in the employment agreement, becomes irrelevant. Since Steranko's employment was at will after Inforex's breach of contract, under common law principles Inforex had almost unbridled discretion to discharge him. *Linscott* v. *Millers Falls Co.* 316 F. Supp. 1369 (D. Mass. 1970), affd. 440 F. 2d 14 (1st Cir.), cert. den. 404 U. S. 872 (1971). See Blades, Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power, 67 Colum. L. Rev. 1404, 1405, 1416 (1967); Summers, Individual Protection Against Unjust Dismissal: Time for a Statute, 62 Va. L. Rev. 481, 482-488 (1976). Cf. *Monge* v. *Beebe Rubber Co.* 114 N.H. 130, 133 (1974). Had Steranko been discharged arbitrarily or maliciously, he might have been absolved of his duty to mitigate damages from Inforex's breach. The justifiable nature of the discharge abrogated his right to damages for that breach.

forex. Under the employee stock restriction agreement (see n.2, *supra*) Inforex was entitled to repurchase these shares for twenty-five cents a share within sixty days of Steranko's discharge if Steranko were discharged for cause. Inforex did in fact demand that he return these with his remaining shares on November 29, 1971. Steranko refused. Since in our view Steranko's discharge was justified by his refusal to assign his patent rights to M-297, we hold that under the employee stock restriction agreement he was obligated to turn over the 2,000 shares to Inforex on demand. That agreement provided that it was to be governed by Massachusetts law. Under our law Inforex is entitled to damages for the diminution in value of the stock in addition to specific performance. *George* v. *Coolidge Bank & Trust Co.* 360 Mass. 635, 641 (1971). The measure is the difference between the fair market value at the time Steranko refused to return the stock (less twenty-five cents a share) and the fair market value on the date judgment shall enter ordering delivery of the 2,000 shares to Inforex. *Ibid.* We leave it to the trial judge to compute the damages owed Inforex by Steranko and to deduct that sum from the amount owed Steranko by Inforex for its refusal to release the restrictions on 22,200 of his remaining shares.

*Personal Liability of Horgan.*

Steranko seeks damages against Horgan individually claiming intentional interference with Steranko's contractual relationship with Inforex. The judge found only that Horgan's actions toward Steranko were "not a result of malevolence or malice." The judge drew no conclusion from that finding.

In the absence of legal justification, intentional interference with a contractual right by a party not privy to the contract is actionable by the party injured. *Cornellier* v. *Haverhill Shoe Mfrs. Assn.* 221 Mass. 554, 559 (1915). *Caverno* v. *Fellows*, 300 Mass. 331, 336-337 (1938). *Owen* v. *Williams*, 322 Mass. 356, 360 (1948). *Backman* v. *Guiliano*, 331 Mass. 231, 232 (1954). *M.F. Roach Co.* v. *Prov-*

*incetown,* 355 Mass. 731, 732 (1969). If such interference is found to be intentional and without justification, it is malicious in law even though it arose from good motives and without express malice. *Grammenos* v. *Zolotas,* 356 Mass. 594, 597 (1970), and cases cited. A defendant may escape liability if the interference was privileged as part of his employment responsibilities. See *Caverno, supra,* at 337; *Owen, supra,* at 360. This rule has particular force as applied to corporate officers, since their freedom of action directed toward corporate purposes should not be curtailed by fear of personal liability. Avins, Liability for Inducing a Corporation to Breach its Contract, 43 Cornell L.Q. 55, 59 (1957). See *Wilson* v. *McClenny,* 262 N.C. 121, 132-134 (1964); *Griswold* v. *Heat, Inc.* 108 N.H. 119, 125 (1967); *Nola* v. *Merollis Chevrolet Kansas City, Inc.* 537 S.W. 2d 627, 634 (Mo. Ct. App. 1976). However, to the extent that a defendant acts out of actual malevolence or malice, the privilege may be lost. See *Holbrook* v. *Morrison,* 214 Mass. 209, 211 (1913); *Caverno, supra,* at 336-337; *Owen, supra,* at 360, citing Restatement of Torts § 766, comment m (1939).

Because Horgan's behavior toward Steranko occurred in the course of his duties as a corporate officer of Inforex, he enjoyed a qualified privilege against liability for interference with Steranko's contractual relationship with the corporation, subject, however, to defeasance if his conduct emanated from actual malevolence or malice. From our review of the voluminous record before us, we conclude that the judge's finding with respect to Horgan's conduct was not clearly erroneous and, therefore, that there is no personal liability on Horgan's part for interference with Steranko's contractual relationship with the corporation.

*Liability of State Street Bank and Trust Co.*

Steranko asserts that under Uniform Commercial Code (UCC), art. 8, G. L. c. 106, § 8, the bank, acting as transfer agent for Inforex stock, is jointly and severally liable with Inforex for its refusal on Inforex's instructions to remove the restrictions from Steranko's shares. To arrive at this

conclusion, Steranko couples two sections of the code, §§ 8-401(2)[18] and 8-406(1).[19]

At the outset we note that the purpose of § 8-406 was to abrogate in situations to which it applies, the common law immunity previously enjoyed by transfer agents against suits for wrongful refusal to transfer stock. See *Kenler* v. *Canal Natl. Bank,* 489 F. 2d 482, 485, n.3 (1st Cir. 1973); *Welland Inv. Corp.* v. *First Natl. Bank,* 81 N.J. Super. 180, 187 (1963); comment 1 to § 8-406 of the Uniform Commercial Code, 2 U.L.A. (Master Ed. 1976).

However, we do not agree that the bank's refusal to remove the restrictive legends from Steranko's shares qualifies as a refusal to "register a transfer" under the terms of § 8-401(2) so as to subject the bank to liability under § 8-406(1). See generally, *Kenler, supra,* at 485. The removal of the legend is the "obvious first step in, and a necessary incident to the contemplated transfer of such stock" (*ibid.*); but it is not the equivalent of the registration of a transfer. In view of our conclusion that this is not a situation to which the UCC applies, the bank retains its common law immunity against suits by injured shareholders. See First Circuit Review, Transfer Agent's Liability to a Stockholder as Affected by The Uniform Commercial Code, 9 Suffolk U.L. Rev. 343, 347, n.15 (1975).

It strikes us as being unduly harsh to require the bank, as transfer agent, faced with Steranko's request and Inforex's order, to refuse that request at its peril based upon its own determination whether Steranko's demotion or

---

[18] Section 8-401(2), as appearing in St. 1957, c. 765, § 1, provides: "Where an issuer is under a duty to register a transfer of a security the issuer is also liable to the person presenting it for registration or his principal for loss resulting from any unreasonable delay in registration or from failure or refusal to register the transfer."

[19] Section 8-406(1), as appearing in St. 1957, c. 765, § 1, provides: "Where a person acts as ... transfer agent ... for an issuer in the registration of transfers of its securities or in the issue of new securities or in the cancellation of surrendered securities ... (b) he has with regard to the particular functions he performs the same obligation to the holder or owner of the security and has the same rights and privileges as the issuer has in regard to those functions."

discharge entitled him to release of the restrictions on his shares, and to incur thereby full liability should a court, after litigation and an opportunity for deliberation, rule against the agent's decision. See id. at 353. Contra, Comment, 18 Rutgers L. Rev. 1170, 1174 (1964). Thus we hold that Steranko is not entitled to damages from the bank.[20]

*Conclusion.*

We summarize our rulings as follows: 1. We agree with the judge that the employment agreement continued in effect after January 7, 1970, on a year to year basis. 2. We agree with the judge that Inforex breached its contract by demoting Steranko from his executive position; but we hold that the breach occurred over the period of time from September, 1970, to May 19, 1971. 3. We disagree with his ruling that the stock restrictions were severable from the rest of the employment agreement and that they remained in effect despite the breach by Inforex. 4. We rule that Steranko did not waive his right to obtain release of the stock restrictions and that he was entitled to have the restrictions on 24,000 shares removed as a result of the breach. 5. We disagree with the judge's conclusion, based on his finding that Steranko would not have sold the stock even if the restrictions had been lifted, that Sterenko was not entitled to damages from Inforex for the latter's refusal to release the restrictions. 6. We rule that the damages are the difference between (a) the highest value of 22,200 shares of stock from January 7, 1972, to a reasonable time thereafter and (b) the value of the stock at the time of trial. 7. We find that after Steranko was demoted from his executive position as vice president in May, 1971, he continued to work on an at will basis. 8. We rule that Steranko was obligated, even as an employee at will, to assign his interest in the M-297 patent rights to Inforex,

---

[20] Contrast *Edina State Bank* v. *Mr. Steak, Inc.* 487 F. 2d 640 (10th Cir.), cert. den. 419 U.S. 883 (1974) (transfer agent liable for refusal to transfer where alleged restrictions not noted on stock certificate); *Welland,* 81 N.J. Super. at 180 (transfer agent liable for refusal to register transfer upon orders of issuer).

and we rule, although for different reasons than those of the judge, that Inforex is entitled to that assignment. 9. We rule that although Steranko might have been entitled to damages for lost salary had he resigned in May, 1971, his refusal to assign his M-297 patent rights in the context of his continued employment violated his duty to mitigate damages. Consequently, we reverse the judge's ruling that Steranko was entitled to $3,500 for lost salary after his discharge in November, 1971. 10. We rule that Inforex is entitled to the return of the 2,000 shares purchased by Steranko under the employee stock restriction agreement as well as damages equal to the difference between the fair market value when Steranko refused to return them (less twenty-five cents a share) and the fair market value on the date judgment shall enter ordering delivery of the 2,000 shares. 11. We accept the judge's finding with respect to Horgan's conduct and rule that Horgan is not personally liable in damages to Steranko. 12. We rule that the bank is not liable to Steranko for its refusal to issue unrestricted stock certificates.

Accordingly, the judgments are reversed and a new judgment is to be entered in each case in part as follows: (1) that the employment agreement remained in full force and effect from July 15, 1968, through January 7, 1970, and annually thereafter until May 19, 1971; (2) that James J. Steranko assign all his right, title and interest in M-297 to Inforex, Inc.; (3) that James J. Steranko is the owner of 24,000 shares of Inforex, Inc., stock, free of restrictions imposed by the employment agreement and the stockholders' agreement; (4) that Inforex, Inc., direct State Bank and Trust Company to remove from the aforesaid shares all such restrictions and to transfer those shares forthwith to James J. Steranko; (5) that James J. Steranko transfer to Inforex, Inc., 2,000 shares purchased by him pursuant to the employee stock restriction agreement of June 23, 1969.

The cases are remanded to the Superior Court for computation of damages against Inforex consistent with this opinion for its wrongful refusal to authorize removal of the

stock restrictions, less damages owed by Steranko for his wrongful refusal to resell his 2,000 shares purchased in accordance with the employee stock restriction agreement. The damages so computed are to be included in the new judgments. No costs are to be awarded to any party.

*So ordered.*