Sosman, J.
Plaintiff EMC Corporation (EMC) brought the present action for breach of contract seeking return of monies it had paid to defendant Clearpoint Research Corporation (CRC). In its amended complaint, EMC has also brought a claim for intentional interference with contractual relations and violation of G.L.c. 93A against defendant Vincent Bono, the president of CRC. Bono has now moved for summary judgment on the ground that, as president and chief executive officer of CRC, he can not be liable *612 for intentional interference with EMC’s contract with CRC and that CRC’s breach of the contract was not a violation of G.L.c. 93A. For the following reasons, defendant Bono’s motion is ALLOWED.
Facts
On June 5, 1992, EMC and CRC entered into an agreement whereby CRC agreed to develop certain computer memory products for EMC.[1] The Agreement set forth a schedule for the project, specifying certain “milestones” that were to be reached by specified dates over the course of the summer and fall of 1992.
The Agreement also set a payment schedule, which was tied to the achievement of the various milestones, Specifically, EMC agreed to pay CRC $600,000 upon execution of the Agreement, $400,000 upon first gate level model simulation demonstration (which was to be achieved by June 15, 1992), and $500,000 upon each of the next three milestones up to the anticipated September 30, 1992 completion of the development and testing of the memory products in question. The Agreement specified that these scheduled payments to CRC were “(f]or and in consideration of the Development of the Products.” The Agreement also made clear that these scheduled payments were the entire price to be paid:
As the full and sole compensation for all of the work performed by Developer [CRC] under Article II hereof, and all rights, title and interests granted by [CRC] under Articles II and III hereof, EMC shall pay to [CRC] the amount specified in Exhibit B, according to the schedule set forth in Exhibit B. The amounts specified in Exhibit B shall be due and payable only upon delivery of the applicable phase of the work to EMC and acceptance by EMC of that phase of the work as set forth in this Agreement, which acceptance shall not be unreasonably withheld. ■
The Agreement also provided that, in the event CRC failed to achieve a stated milestone on schedule, CRC “shall devote all appropriate resources to this project until it is back on schedule.” CRC agreed that, during the term of the Agreement, it would not “perform any work for any third party which would materially conflict with, or create any material impediment against, [CRC] performance of any active or proposed Project(s) under this Agreement.” If delay in completion of any milestone exceeded certain limits, the Agreement gave EMC the option to terminate the Agreement or to proceed with the Agreement with decreased price or purchase obligations on its part. If EMC elected to terminate the Agreement on account of CRC delay, EMC was to grant CRC an exclusive license to the development products and CRC was to “pay back to EMC all moneys paid by EMC in connection with the milestones set forth above, over a period of one year in four (4) equal payments.” Otherwise, the parties expressly agreed that there would be no liability for incidental or consequential damages for any form of breach (other than breach of the Agreement’s confidentiality provisions).
The Agreement contained an integration clause, specifying that the written agreement was “the complete and exclusive statement of the agreement between the parties and supersedes all prior oral and written communications, agreements, representations, statements, negotiations, and undertakings between the parties relating to the subject matter hereof.” The Agreement also provided that modifications would not be binding unless made in writing and signed by both sides.
The Agreement was executed and the first scheduled payment of $600,000 was made on or about June 5, 1992. The next milestone, to be achieved by June 15, 1992, was not reached by that date. On July 8, 1992, the parties modified the definition for that milestone and changed the payment terms. The milestone, originally defined as a simulation demonstration “of a successful signature analysis for a given set of SCAN vectors (provided by EMC), and demonstration of a read and write memory operation,” was now defined as a “50% random vector success rate (of 10 vectors) at the Behavioral Level Model, and demonstration of a read and write memory operation.” In advance of achieving that modified milestone, EMC agreed to loan $400,000 to CRC “as an advance against” that milestone. The loan was evidenced by a demand promissory note. The $400,000 was advanced to CRC sometime shortly after the parties’ July 8 agreement.
On August 6, 1992, EMC confirmed in writing that CRC had achieved that milestone (as modified). Where the milestone had been achieved, EMC confirmed that “the loan advanced by EMC to Clearpoint in accordance with our amended Agreement is hereby canceled as evidenced by our return of the Note marked ‘Canceled.’ ” CRC in turn formally acknowledged that “the cancellation of the note is in complete fulfillment of EMC’s obligations in connection with the achievement of the second milestone.”
CRC did not achieve any further development milestones, and no further payments were made. On October 29, 1992, EMC wrote to CRC reserving its rights with respect to CRC’s failure to meet the project schedule. On February 10, 1993, EMC wrote to CRC announcing its election to terminate the Agreement and demanding the return of the $1,000,000 previously paid to CRC. Under the Agreement, the amount was to be paid back in four equal installments. Thus, EMC demanded four payments of $250,000, to be made on May 7, 1993, August 7, 1993, November 7, 1993, and February 7, 1994.
On April 13, 1993, EMC filed the present action against CRC seeking a declaratory judgment with respect to the monies allegedly owing and claiming breach of contract and “money owed and due.” On April 21, 1993, EMC obtained a prejudgment attachment against CRC in the amount of $1,020,220.07, *613 but was unable to identify or locate any assets of CRC to attach.
On May 4, 1993, EMC filed an amended complaint naming Vincent Bono as a defendant. Bono was, at all relevant times, the president and controlling shareholder of CRC. The amended complaint alleged that Bono, and other unidentified persons at CRC acting under his direction, “diverted up to One Million Dollars ($1,000,000) from the project for purposes other than those contemplated under the Agreement.” The amended complaint then sought to recover from Bono individually for having “intentionally and maliciously interfered with the June 5, 1992 Agreement by apparently diverting up to One Million Dollars ($1,000,000) from the Memory Product Project for purposes other than those contemplated under the terms of the Agreement."
On July 16, 1993, CRC was placed in bankruptcy by way of an involuntary petition. On August 6, 1993, the case was converted to Chapter 11. CRC was ultimately liquidated, and EMC has not received any payment from CRC.
Discussion
1. Intentional interference with contractual relations
EMC contends that the monies paid to CRC were not used exclusively for the development project set forth in the Agreement. It further contends that Bono directed the expenditure of those funds and thereby “diverted” them from the EMC project. Bono’s decision to “divert” the proceeds is the alleged intentional interference with EMC’s contract.[2]
Central to EMC’s theory of the case is the assertion that the contract required CRC to expend the funds solely on the EMC development project. The Agreement contains no such requirement, nor is there any ambiguity on the issue that would require resolution at trial. Absent some ambiguity, the interpretation of a written contract is a matter of law for the court to decide. Lexington Insurance Co. v. All Regions Chemical Labs, Inc., 419 Mass. 712, 713 (1995).
Nowhere does the parties’ Agreement place any express restriction on the uses of the monies paid to CRC. The scheduled payments were “for and in consideration of the development of the products and were specified to be CRC’s “full and sole compensation for all of the work performed.” Milestone payments were only to be made upon “delivery” of the phase in question and EMC’s “acceptance” of that phase. Where EMC was paying for work that was completed, and that payment was the sole “compensation” to be received by CRC, the payments became CRC’s to use at its discretion, subject only to the contractual requirement that if the project were not completed CRC would have to repay EMC the full amount in four installments. If the project fell behind schedule, there was a requirement that CRC “devote all appropriate resources to this project until it is back on schedule.” Nowhere does the contract define the term “all appropriate resources,” nor does it suggest that prior payments were to be held in any form of reserve to insure that those specific resources would still be available. Neither by express terms nor by implication does this contractual arrangement set any restrictions on CRC’s use of the payments from EMC.
EMC argues that Bono has given inconsistent versions as to how the funds were spent.[3] Whether Bono’s version is consistent or not, there was simply no contractual requirement that the monies be spent or held in any particular way. The payments were the agreed upon price which, once earned and paid, were CRC’s funds to do with as it saw fit.
It is true that CRC breached the Agreement. It did not complete the project milestones as promised, and it has not paid back the agreed upon amount upon EMC’s election to terminate the contract. It could certainly be inferred that Bono, by spending CRC’s resources on other projects, effectively decided that CRC would breach its agreement with EMC. However, an employee of a contracting corporation is not ordinarily held liable for intentional interference with contracts of that corporation. As long as the employee “acted for a purpose that was ‘part of his employment responsibilities,’" the interference is privileged. Union Mutual Life Insurance Co. v. Chrysler Corp., 793 F.2d 1, 12 (1st Cir. 1986), quoting Steranko v. Inforex, Inc., 5 Mass.App.Ct. 253, 272-73 (1977). A corporate officer’s “freedom of action directed towards corporate purposes should not be curtailed by fear of personal liability.” Steranko, 5 Mass.App.Ct. at 273.
In Union Mutual, an officer had directed the corporation in question to breach a sublease agreement. Noting that Massachusetts law does not make corporate officers liable for the corporation’s breach of contract (G.L.c. 156, §38), the First Circuit reversed that portion of the trial court’s ruling that had imposed such personal liability on the officer. With regard to the argument that this was tortious interference with the corporation’s contractual relations, the First Circuit noted case law requiring a showing of actual malice on the part of the officer or employee. See Gram v. Liberty Mutual Insurance Co., 84 Mass. 659, 663 (1981); Laurendeau v. Kewaunee Scientific Equipment Corp., 17 Mass.App.Ct. 113, 123 (1983). The fact that the breach was motivated by a desire to save money did not constitute “actual malice.” Nor did the obvious nature of the breach am omit to “actual malice.” Directing a corporation to breach an “unfavorable contract” was simply part of the officer’s duties. 793 F.2d at 11-12. See also Boothby v. Texon, Inc., 414 Mass. 468, 487 (1993), quoting Sereni v. Star Sportswear Manufacturing Corp., 24 Mass.App.Ct. 428, 432-33 (1987) (noting that “malice” in this context refers to “a spiteful, malignant purpose, unrelated to the legitimate corporate interest”).
*614 Here, there can be no dispute that decisions as to the expenditure and allocation of corporate resources amongst the various corporate obligations was part of Bono’s job as president of CRC. Nor does EMC have any evidence that Bono made those choices with any kind of malice or other improper purpose. Indeed, by definition, a corporation that is sliding into an involuntary bankruptcy can not meet all of its ongoing obligations, and the president of such a corporation must of necessity choose which obligations will be given priority over others. All that EMC can show is that Bono chose to spend CRC’s dwindling resources on projects and obligations other than the development work called for by the Agreement. That is insufficient to demonstrate any malice or impropriety that would overcome Bono’s privilege to make such decisions.
II. G.L.c. 93A
EMC also seeks to impose individual liability on Bono for unfair and deceptive trade practices in violation of G.L.c. 93A. A corporate officer may be held personally liable for his “participation in unfair and deceptive practices.” Nader v. Citron, 372 Mass. 96, 103 (1977); The Community Builders, Inc. v. Indian Motocycle Associates, Inc., 44 Mass.App.Ct. 537, 560 (1998).
Here, EMC points to nothing other than CRC’s breach of contract and, by inference, Bono’s involvement in the corporate decision to breach that contract. A breach of contract, without more, does not amount to an unfair and deceptive trade practice. Massachusetts Employers Insurance Exchange v. Propac-Mass, Inc., 420 Mass. 39, 43 (1995), citing Whitinsville Plaza, Inc. v., 378 Mass. 85, 100-01 (1979). EMC’s theory that Bono wrongfully diverted proceeds of this contract to other projects is not even a breach of contract, let alone an unfair or deceptive trade practice. EMC has no evidence of fraud, deceit, coercion or other unethical conduct. It has no evidence of anything other than a corporation failing to meet its obligations during the final year of its existence before being put into involuntary bankruptcy and liquidated. That does not amount to any violation of G.L.c. 93A.
III. G.L.c. 231, §6F
In his motion, Bono has also sought to recover attorneys fees and costs pursuant to G.L.c. 231, §6F. The court declines such an award. This claim against Bono was commenced prior to the bankruptcy proceedings and at a time when EMC did not know what had happened to the $1,000,000 it had paid to CRC. At that juncture, there would be reason at least to inquire whether corporate assets of CRC had been or were being wrongfully diverted from CRC itself. In that posture, the filing of a claim against Bono was neither frivolous nor in bad faith. Where neither the trustee in bankruptcy nor EMC has since uncovered any such wrongdoing by Bono, EMC’s pursuit of this claim does now border on the frivolous. However, the claim was not frivolous at the outset and, with the allowance of this summary judgment motion, the case has terminated at approximately the point at which it became frivolous. It is therefore not appropriate to award Bono costs and attorneys fees under G.L.c. 231, §6F.
ORDER
For the foregoing reasons, defendant Vincent Bono’s Motion for Summary Judgment is ALLOWED and his request for costs and attorneys fees pursuant to G.L.c. 231, §6F is DENIED.

The contract, originally entitled “Product Development and Purchase Agreement," was later referred to as the “Partnership Agreement.” The wording of the agreement itself specifies that CRC and EMC were “independent contractors” and expressly disclaims any form of partnership or joint venture between them (Article XXV).

EMC did not get any form of personal guarantee from Bono, and Bono is not personally liable for the debts of his corporation.

EMC has not produced any evidence tending to show that Bono took any of the funds for his own personal use. The allegation is that he directed the funds be used to pay other obligations of CRC or to pursue other corporate projects. Even if Bono wrongfully took corporate funds for his own personal use, that claim would belong to the trustee in bankruptcy, not to EMC. If any corporate assets were improperly transferred to Bono, they would be recoverable by the trustee for the benefit of all claimants in the bankruptcy proceedings. In granting Bono’s motion for summary judgment, the court is not expressing any views or opinions as to potential claims by the trustee.