JOHN A. WILLIAMS *vs.* B & K MEDICAL SYSTEMS, INC.,
& another.[1]

No. 97-P-1768.

Middlesex. April 13, 1999. - July 7, 2000.

Present: BECK, DREBEN, & GILLERMAN, JJ.

*Practice, Civil,* Findings by judge. *Contract,* Employment, Performance and
breach, Interference with contractual relations, Implied covenant of good
faith and fair dealing. *Accord and Satisfaction. Labor,* Discharge. *Dam-
ages,* Breach of contract, Mitigation, Attorney's fees.

In a breach of contract action, the judge's findings that the defendant acted
arbitrarily and capriciously in terminating the plaintiff's employment and
that the defendant breached the plaintiff's employment contract were not
clearly erroneous. [567-569]

In a breach of contract action, a letter of resignation and a written severance
agreement did not constitute an accord and satisfaction, and the judge cor-
rectly determined that the defendant employer was liable for additional
severance pay. [569-570]

In an action alleging breach of an employment contract, the judge correctly
concluded that the plaintiff was entitled to severance pay for the entire
period of his unemployment following his termination, and his higher sal-
ary at his new job properly was regarded not as mitigation. [571]

In an action alleging intentional interference with contractual relations, suf-
ficient evidence supported the judge's determination that the defendant
intentionally induced its subsidiary corporation to violate its employment
contract with the plaintiff by threats and false accusations in order to force
him to resign without having to pay substantial severance required by the
contract [571-573]; further, the conduct was sufficiently egregious to war-
rant relief under G. L. c. 93A [577].

The interest of a corporation as the owner of a majority interest in the parent
company of the employer of a plaintiff in a civil action was not
demonstrated to be such as would warrant a conclusion that the corpora-
tion was privileged to interfere with the plaintiff's employment contract for
any legitimate corporate purpose. [573-577]

In an action for breach of contract in which the judge also found a violation
of G. L. c. 93A, the issue of attorney's fees was remanded for further
consideration. [577]

CIVIL ACTION commenced in the Superior Court Department on
August 15, 1994.

[1]Analogic Corporation.

The case was heard by *Charles T. Spurlock,* J.

*Bruce G. Garr* for the defendants.

*Eric P. Finamore* for the plaintiff.

Beck, J. This case requires us to consider the legal standards governing corporate conduct in terminating the employment of an executive who has a written employment contract. In addition to a breach of contract claim, the issues include accord and satisfaction, mitigation of damages, and a related company's intentional interference with contract. The employer and its "grandparent" company appeal from a Superior Court judge's findings in favor of the employee.

1. *Factual background.* The facts, as set out in the judge's memorandum of decision, augmented by additional facts in the record consistent with the trial judge's findings, are as follows. See *Bruno* v. *Bruno,* 384 Mass. 31, 35 (1981).

a. *The parties.* In February, 1989, John A. Williams, the plaintiff, signed an offer of employment to be the national medical sales manager in the United States for Bruel & Kjaer Instruments, Inc. (Bruel & Kjaer), a Danish company specializing in "sound, vibration and data analysis instrumentation." He was subsequently promoted to vice-president. In the spring of 1992, the plaintiff signed an employment contract with Bruel & Kjaer and a "to-be newly formed medical company." That new company was incorporated as B & K Medical Systems, Inc. (B & K), in May or June of 1992, with the plaintiff as president. In August, 1992, Analogic Corporation (Analogic) purchased a controlling interest in the Danish parent company of B & K. (The record is confusing as to the identity of the parent company.)

b. *The contract.* As relevant here, the employment contract executed in April, 1992, contained the following terms:

> "Commission Program: You will receive 0.2% on medical instrument shipments . . . .
>
> "Car Allowance: Bruel & Kjaer Instruments, Inc. will continue to pay a Car Allowance in the amount of $500.00 per month including insurance, gasoline and normal maintenance. . . .
>
> "Severance Clause: Other than for-cause reasons (performance or misconduct), employment may be terminated by

either party by giving not less than twelve (12) calendar months notice in writing to the other party, and during which period of termination, full base salary and benefit continuation will be provided.

"In the event either entity is sold or a takeover occurs (hostile or amicable) the above severance clause will remain in effect."

The plaintiff's base salary was to "remain constant at $120,000."

c. *The termination.* On August 18, 1993, the plaintiff was scheduled to meet with Carl Simony, the international sales manager of Bruel & Kjaer, who was one of the plaintiff's supervisors. Plans were changed at the last minute. The meeting was held at Analogic's headquarters in the office of Julian Soshnick, the vice-president and general counsel of Analogic. Upon the plaintiff's arrival, Soshnick demanded the plaintiff's resignation and said that, if the plaintiff did not submit his resignation, he would be discharged. Soshnick warned the plaintiff that, if the plaintiff did not sign the letter of resignation, which had already been prepared, Soshnick would create a "black cloud" around the plaintiff's career, and the plaintiff would never find employment in the medical products industry again.

The purported basis of the demand for the plaintiff's resignation was the conclusion of B & K's parent company that the plaintiff had received approximately $10,519 in excess commissions and excess car expense reimbursements under the 1992 contract. As to the commissions, the plaintiff had received two-tenths of one percent of the total invoices, which included "instruments, sales, service, [and] warranty." Soshnick claimed the plaintiff was entitled to a commission only on the charges for the instruments themselves. As to the car allowance, the dispute concerned the meaning of the word "including" — whether the plaintiff was to receive reimbursement for insurance, gasoline, and normal maintenance in addition to the $500, or whether the $500 was intended to be the entire allowance.

Soshnick demanded an immediate answer and stated that the resignation was not negotiable. The plaintiff requested severance pay. Soshnick offered two and one-half months, making clear that if the plaintiff rejected that offer he would be terminated and receive nothing. After a brief telephone call to a

lawyer, the plaintiff accepted the two and one-half months and signed the letter of resignation. The plaintiff testified he told Soshnick that anything he signed would be under duress.

d. *Prior proceedings.* In 1994, a year after the meeting with Soshnick, the plaintiff filed this action against B & K and Analogic. At a jury-waived trial in October, 1996, a Superior Court judge heard testimony from four witnesses: the former payroll, commissions, and fleet car administrator at Bruel & Kjaer and B & K; the former controller at Bruel & Kjaer and B & K; the plaintiff; and Soshnick. Soshnick's testimony was limited to the information disclosed at his deposition, when he claimed an attorney-client privilege.

The judge found that "based on the testimony and all of the credible evidence presented . . . the plaintiff's termination was arbitrary and capricious. The employer did nothing to attempt to discern whether [the plaintiff's] receipt of so called 'excess' reimbursement was intentional or by mistake. .., . The money received by the plaintiff, which was less than ten percent of his annual salary, was never questioned during his employment . . . . [F]orcing . . . the plaintiff to resign without paying the severance required by the contract constituted a breach of its contract." However, the judge rejected the plaintiff's claims against Analogic on the ground that Analogic was the parent corporation of B & K and therefore not a third party "in this situation." Despite his finding against the plaintiff on his claims against Analogic, the judge awarded the plaintiff contractual severance pay with interest against the defendants (plural) "for the month of November and that proportional share of December, 1993, until he was hired and on the payroll [of his new employer] as well as his costs of litigation and reasonable attorneys' fees."

Several months later, the judge, presumably in response to the plaintiff's motion to "amend rulings of law," issued an "order of amendment" pursuant to Mass.R.Civ.P. 52(b), as amended, 423 Mass. 1402 (1996). The order struck the original rulings on the claims against Analogic and inserted the following ruling: "Soshnick, on behalf of Analogic, intentionally and unjustifiably interfered in the employment contract which existed between the plaintiff and B & K Medical Systems, Inc., by falsely accusing the plaintiff of knowingly receiving improper payments and demanding his immediate resignation." The judge further found that "[t]he intentional interference of Analogic

Corporation in the contractual relationship between B & K Medical Systems, Inc., and the plaintiff constitutes an unfair and deceptive act prohibited [by G. L. c. 93A, § 2]." "In all other respects," including the awards of damages and attorneys' fees, the earlier decision and judgment were to stand.

2. *Discussion.* In their brief on appeal, the defendants set out in nine numbered subheadings multiple errors in the judge's findings. As the defendants acknowledge, a judge's findings are not to be set aside "unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." *Starr* v. *Fordham*, 420 Mass. 178, 182 (1995), quoting from Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). This standard applies to findings of subsidiary facts as well as to ultimate findings. *Starr* v. *Fordham*, 420 Mass. at 182. The question is not whether we would have arrived at the same result as the trial judge but rather whether, on the entire evidence, we are "left with the definite and firm conviction that a mistake has been committed." *Id.* at 186. We discuss each of the claimed errors, adding such further facts as may be necessary.

a. *Breach of contract.* The defendants set out a litany of reasons why the judge erred in finding that the plaintiff's termination was wrongful. We discuss the most fundamental: (1) that B & K did not exist at the time of the contract and therefore cannot be held to its terms; and (2) that in any case the payments to the plaintiff were clearly improper. As to the first point, we think it sufficient to point out that the contract explicitly says, "This letter will confirm your contract and 1992 Compensation Program between you and Bruel & Kjaer Instruments, Inc., USA and the to-be newly formed medical company." The terms were accepted by Niels Kryger Andersen "[o]n behalf of the to-be newly formed medical company." There is no dispute that B & K was the "to-be newly formed" company. We see no basis for allowing B & K to repudiate the contract that was made on its behalf, by its parent company. See *Polaroid Corp.* v. *Rollins Envtl. Servs. (NJ), Inc.*, 416 Mass. 684, 696-697 (1993) (party bound by its outward manifestations), citing Restatement (Second) of Contracts § 2 comment b (1981).

Under their interpretation of the contract, the defendants claim that the car payments and commissions were clearly excessive. Contrary to the defendants' argument, the words of

the contract, particularly in view of the course of dealing between the parties, see *Keating* v. *Stadium Mgmt. Corp.*, 24 Mass. App. Ct. 246, 251-252 (1987), are not "plain and free from ambiguity." See generally *Starr* v. *Fordham*, 420 Mass. at 190. The judge found that the termination was arbitrary and capricious because "[t]he employer did nothing to attempt to discern whether [the plaintiff's] receipt of so called 'excess' reimbursement was intentional or by mistake." The judge implicitly rejected the defendants' argument that, since the plaintiff thought he was entitled to the payments, they were intentional and therefore wrongful. This finding is not clearly erroneous.

The judge found that there had been no previous objection to the plaintiff's receipt of the same benefits under previous contracts. From the date of the plaintiff's hiring in 1989 until his termination on August 18, 1993, the commission payments had been based on the total of the invoices, and the car allowances, had included the additional charges. No one at either Bruel & Kjaer or B & K had ever objected to or otherwise commented upon the plaintiff's receipt of these payments.

The precise differences between the 1992 contract and the preceding contract, to which the defendants attach so much significance, were the addition of the word "instrument" in the commission program and the increase from $450 to $500 in the car allowance. There is no evidence in the record that anyone attached significance to these changes. Nor is there any evidence of an intent to change the terms of the previous contracts (other than Soshnick's testimony which the judge did not credit). The documentary evidence shows that, in early March, 1992, the plaintiff sent a memorandum to Simony regarding his employment agreement. He proposed a fifty percent increase in the commission and indicated that the "auto" provision of "net $450 . . . plus insurance, fuel & maintenance" "remains the same." Simony sent his comments two weeks later. Simony rejected the plaintiff's request to increase the commission component, indicating that "at this point . . . [we] only can offer to continue the contract as it is." (Apparently the increase from $450 to $500 in the car benefit reflected the fact that the monthly lease payments for two other senior managers who had rented cars had increased from $450 to $500 because they were given new cars.)

The judge's finding that B & K breached the plaintiff's

employment contract is not clearly erroneous. It is consistent with the "implied covenant of good faith and fair dealing between parties to a contract. *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471 (1991). Such a covenant requires 'that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' *Id.* at 471-472." *Blank* v. *Chelmsford Ob/ Gyn, P.C.*, 420 Mass. 404, 407 (1995). The judge reasonably could have found that the refusal to allow the plaintiff time to respond to the accusations, the insistence on limiting the severance payment, and the threat to ruin the plaintiff's career violated that covenant. Compare *Klein* v. *President & Fellows of Harvard College*, 25 Mass. App. Ct. 204, 208 (1987) (distinguishing just cause from "discharge on unreasonable grounds or arbitrarily, capriciously, or in bad faith").

b. *Accord and satisfaction.* In addition to signing the letter of resignation Soshnick had drafted, the plaintiff also signed a letter that Simony had already signed "confirming and agreeing" to the two and one-half months of lump sum severance pay. The body of the letter was as follows:

> "In view of your valuable services to this Company and your resignation, we agree to pay you two and one-half months base salary as severance pay, in addition to any monies due you on account of expenses, commissions or salary arrearage."

The defendants claim these letters constituted an accord and satisfaction.

"Whether an accord and satisfaction has been proved is a question of fact on which the defendant[s] [have] the burden of proof." *Wong* v. *Paisner*, 14 Mass. App. Ct. 923, 924 (1982). See *Emerson* v. *Deming*, 304 Mass. 478, 483 (1939). See also Mass.R.Civ.P. 8(c), 365 Mass. 750 (1974). In finding B & K liable for additional severance pay, the judge implicitly rejected the defendants' defense on this point.

The cases the defendants cite to support their argument that there was an accord and satisfaction are distinguishable. In *Coveny* v. *President & Trustees of the College of the Holy Cross*, 388 Mass. 16, 22-23 (1983), a college student facing expulsion for misbehavior admitted that he "freely and voluntarily," *id.* at 22, signed a "binding general release which recited a consider-

ation and was under seal, and which waived all past, present or future claims against the college." *Id.* at 21. See *Cody* v. *Beckman*, 433 F.2d 1260, 1261 (1st Cir. 1970), quoting from *Worcester Color Co.* v. *Henry Wood's Sons Co.*, 209 Mass. 105, 109 (1911) ("the acceptance and collection of a check, proffered upon condition that it is in full settlement of an unliquidated claim . . . bars any attempt to collect the balance"); *In re Boston Shipyard Corp.*, 886 F.2d 451, 454 (1st Cir. 1989) (contract modification stated it was in satisfaction of all contractor's claims including any and all potential claims); *Abbadessa* v. *Moore Bus. Forms, Inc.*, 987 F.2d 18, 19 (1st Cir. 1993) ("agreement also provided that [the plaintiff] and [his employer] released each other from any other claims or obligations arising from [the plaintiff's] employment with, and termination by, [the defendant employer]").

Here, neither of the documents the plaintiff signed clearly indicated that by signing he agreed to forgo any additional relief. See *Bud McDevitt Real Estate, Inc.* v. *Corona*, 27 Mass. App. Ct. 1129, 1130 (1989) (cover letter explicitly stated cashing or deposit of check shall be considered agreement that it be "in full satisfaction of any and all claims"; defendants relieved of further responsibility). See also *Malave* v. *Carney Hosp.*, 170 F.3d 217, 222 (1st Cir. 1999) ("accord and satisfaction requires a voluntary, mutually assented to exchange of money for a release"). See generally 1 Am. Jur. 2d, Accord and Satisfaction (1994): § 16 (no accord and satisfaction if no clear expression of condition); § 57 (existence of accord and satisfaction generally based on intent of the parties, which is a question of fact, citing *Bliss* v. *New York Cent. & H.R.R. Co.*, 160 Mass. 447, 454-456 [1894]). Compare *Cadle Co.* v. *Hayes*, 116 F.3d 957, 962 (1st Cir. 1997) ("Massachusetts law is pellucid that, in the absence of convincing evidence of mutual assent, mere partial payment of an existing debt does not constitute an accord and satisfaction"). The judge's rejection of the defendants' accord and satisfaction defense was not clearly erroneous.

In view of our conclusion that the judge did not err in rejecting the defendants' argument that there was an accord and satisfaction, we need not reach the plaintiff's argument that he signed the documents under duress or the defendants' counter argument that the plaintiff's acceptance of the severance payment constituted ratification. See *Di Massa* v. *Great Am. Novelty Co.*, 314 Mass. 1, 3 (1943) (resolving claim of duress is question of fact).

c. *Mitigation.* At the time of the plaintiff's resignation, B & K agreed to pay him two and one-half months' salary in a lump sum as severance. The plaintiff was actually unemployed for four months. In mid-December, 1993, the plaintiff began a new job at a higher salary in California. He was separated from his family for a year. The judge determined that the plaintiff was entitled to severance pay for the entire period of his unemployment, and awarded him $15,000 for the additional month and one-half during which he was unemployed. The defendants claim that, since the plaintiff earned more in his new job between December, 1993, and August, 1994, than he would have earned had he stayed at B & K, he is not entitled to the additional severance pay.

"The basic principle of contract damages is that the aggrieved party should be put in as good a position as if the other party had fully performed." *Laurin* v. *DeCarolis Constr. Co.,* 372 Mass. 688, 691 (1977), citing 5 Corbin, Contracts § 992 (1964). In a claim for breach of an employment contract, the employer has the burden of proof on mitigation. *McKenna* v. *Commissioner of Mental Health,* 347 Mass. 674, 677 (1964). Here, the contract provided for a twelve-month notice for termination (other than for cause and the judge rejected the defendants' claim that the plaintiff's termination was for cause). According to the contract, during a twelve-month "period of termination," the plaintiff was to receive "full base salary and benefit[s]." The judge concluded that the plaintiff had a reasonable expectation of employment for twelve months after termination and was therefore entitled to the salary he would have earned had he left B & K for the California job voluntarily, without the intervening period of unemployment. (At trial, the plaintiff claimed he was entitled to a full year's severance pay; he has not filed a cross appeal.) Whatever the correct interpretation of the contract may have been, the award of damages for breach of the severance provision is not inconsistent with governing legal principles. Compare *Black* v. *School Comm. of Malden,* 369 Mass. 657, 663 (1976) (earliest date comparable employment available is factor to consider); *Kaltsas* v. *Duralite Co.,* 4 Mass. App. Ct. 634, 636 (1976) (money earned in family business not to be considered in mitigation of damages where same as amount earned in addition to salary during employment).

d. *Interference with contract.* In his order of amendment, the judge found that Analogic "improperly and knowingly induced

[B & K] to violate its contract with the plaintiff by making false accusations against the plaintiff." Analogic argues that it did not interfere, or, in the alternative, if it did, it was privileged to do so.

"To make out a case of intentional interference with a contract, a plaintiff must prove that '(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.' " *Melo-Tone Vending, Inc.* v. *Sherry, Inc.*, 39 Mass. App. Ct. 315, 318 (1995), quoting from *G.S. Enterprises, Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 272 (1991).

(i) *Interference*. First, Analogic claims there was insufficient evidence it made the decision to terminate the plaintiff. However, there is no dispute that the original plan for the plaintiff to meet with Simony was changed and that Soshnick appeared to be in charge of the termination meeting. Soshnick testified that he gave his opinion that the payments were wrongful, that he composed the termination letters, and that it was his job to determine whether there had been a mistake. It was also Soshnick who concluded there was no mistake because the plaintiff thought he was entitled to the payments, essentially eliminating good faith misunderstanding of the terms of the agreement as an explanation for the payments. The plaintiff testified that Simony "was silent throughout the meeting" and described Soshnick's demeanor as "[m]ean-spirited and enjoying the termination process." Moreover, the plaintiff testified that he had been at a meeting where Soshnick said he would find a way to avoid the one-year severance agreement with another person (in fact the person who signed the plaintiff's 1992 contract on behalf of the "to-be newly formed medical company").

From this evidence, the judge could infer that Soshnick, as the vice-president and general counsel, was acting on behalf of Analogic, particularly given Soshnick's long tenure with the company and allegedly close relationship with the chief executive officer. See *Pheasant Ridge Assocs. Ltd. Partnership* v. *Burlington*, 399 Mass. 771, 777 (1987) (action, words, and knowledge of corporation's employees acting within their authority may be attributed to corporation). The judge was not required to believe Soshnick's testimony that an entity other

than Analogic made the decision to terminate, especially given the limited and confusing evidence concerning the relationship between Analogic and B & K's parent company. In any case, there is no requirement that a defendant in a tortious interference case be acting alone. See *Phil Crowley Steel Corp.* v. *Sharon Steel Corp.*, 782 F.2d 781, 783 (8th Cir. 1986). We do not address Analogic's belated argument on appeal that Soshnick was not acting within his authority, for which there is no evidence in any case. See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. at 471.

The judge also found that Analogic used improper means "by making false accusations." He would also have been warranted in finding that Soshnick threatened the plaintiff. See *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. 811, 817 (1990) (improper means include the use of threats, misrepresentation of the facts, and defamation). The judge implicitly found improper motive as well in concluding that the defendants' charge of excess payments was aimed at "forcing . . . the plaintiff to resign without paying the severance required by the contract."

(ii) *Privilege.* Second, Analogic argues that even if it did interfere, as the "grandparent" of B & K, any interference was privileged. "No question of privilege arises unless the interference would be wrongful but for the privilege." *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. at 816, quoting from *Top Serv. Body Shop, Inc.* v. *Allstate Ins. Co.*, 283 Or. 201, 209-210 (1978). "As in other instances where justification is required, the burden of proof [is] upon the defendant to establish the existence of [privilege]." *Owen* v. *Williams*, 322 Mass. 356, 360 (1948); *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. at 812. Therefore, the elements of a claim for intentional interference with contract in Massachusetts do not include a showing of a lack of privilege. See *G.S. Enterprises, Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. at 272; *Melo-Tone Vending, Inc.* v. *Sherry, Inc.*, 39 Mass. App. Ct. at 318. See also *Charles River Data Sys., Inc.* v. *Oracle Complex Sys. Corp.*, 788 F. Supp. 54, 59 (D. Mass. 1991) (privilege is affirmative defense to claim of contractual interference under Massachusetts law). (In some other jurisdictions, however, the plaintiff bears burden of proving lack of legal justification. See *Phil Crowley Steel Corp.* v. *Sharon Steel Corp.*, 782 F.2d at 783 [applying Missouri law]; *Bendix Corp.* v. *Adams*, 610 P.2d 24, 27 [Alaska 1980]; *Yaindl* v. *Ingersoll-Rand Co. Standard Pump-Aldrich Div.*, 281 Pa. Super. 560, 581 n.11 [1980]).

In support of its claimed privilege, Analogic argues that, even if its motive was improper, it is not liable because its motive was not "tantamount to a 'spiteful, malignant purpose, unrelated to the legitimate corporate interest,' " quoting from *Sereni* v. *Star Sportswear Mfg. Corp.*, 24 Mass. App. Ct. 428, 432-433 (1987). *Sereni* is from a line of cases concerning a superior's privilege to terminate an employee he supervises, where both the employee and the supervisor work for the same entity. See, e.g., *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659 (1981), *S.C.*, 391 Mass. 333 (1984); *Boothby* v. *Texon, Inc.*, 414 Mass. 468 (1993); *Steranko* v. *Inforex, Inc.*, 5 Mass. App. Ct. 253, 272-273 (1977) (collecting cases), *S.C.*, 8 Mass. App. Ct. 523 (1979); *Mathias* v. *Beatrice Foods Co.*, 23 Mass. App. Ct. 915 (1986); *Mailhiot* v. *Liberty Bank & Trust Co.*, 24 Mass. App. Ct. 525 (1987); *Alba* v. *Sampson*, 44 Mass. App. Ct. 311 (1998). These cases stand for the proposition that "[a] defendant may escape liability if the interference [is] privileged as part of his employment responsibilities. This rule has particular force as applied to corporate officers, since their freedom of action directed toward corporate purposes should not be curtailed by fear of personal liability." *Steranko* v. *Inforex, Inc.*, 5 Mass. App. Ct. at 273 (citations omitted). "In the employment and discharge context, the law of this jurisdiction . . . protect[s] a corporate official's freedom of action by requiring proof that the official acted with actual malice." *Alba* v. *Sampson*, 44 Mass. App. Ct. at 314.

However, this case does not involve an employee and his supervisor. Here the interfering party was a corporation that owned a majority interest in the parent company of the plaintiff's employer. The question is whether the standard discussed above applies to cases in which the interfering party is not a corporate officer of the employer. The parties have not cited, nor have we found, any Massachusetts cases on point, i.e., holding that the supervisor standard applies in these circumstances. We therefore turn to the usual sources.

We begin our analysis with the Restatement (Second) of Torts (1979). Responding to "a blurring of the significance of the factors involving liability" in interference with contract cases, *id.* at Introductory Note to ch. 37, at 5, the Restatement avoids the use of the word privilege as well as the word justification. It settles instead on the word "improper." *Id.* at 5-6. The factors to be considered in determining whether interference is improper are set out in § 767. Section 769

articulates the special rule governing an "Actor Having [a] Financial Interest in [the] Business of [the] Person Induced." It states as follows:

> "One who, having a financial interest in the business of a third person intentionally causes that person not to enter into a prospective contractual relation with another does not interfere improperly with the other's relation if he
>
> > (a) does not employ wrongful means and
> >
> > (b) acts to protect his interest from being prejudiced by the relation."

As we have already noted, the judge found that Analogic used wrongful means.

We therefore turn to the question of whether there was evidence that Analogic's interest in the plaintiff's employment contract was sufficient to support Analogic's claim of privilege. Out-of-State cases addressing the privilege of a parent company to interfere in contracts involving a subsidiary company stress the necessity of proving that the interfering party had a direct financial interest in the contract at issue. See, e.g., *Bendix Corp.* v. *Adams*, 610 P.2d 24 (parent may limit funding for subsidiary's contract with third party where subsidiary failed to find market for its proposed project; held: parent acted to protect its own economic interest); *Sunamerica Financial, Inc.* v. *260 Peachtree St., Inc.*, 202 Ga. 790, 798 (1992) (parent company directed wholly owned subsidiary to withhold rent payments based on claim that lessor failed to fulfill its obligation to permit subleasing under a lease in which the lessee was the subsidiary; held: parent has qualified privilege to interfere with a wholly-owned subsidiary's contract with third party when the contract threatens a present economic interest of subsidiary, absent clear evidence that the parent employed wrongful means or acted with improper purpose). Contrast *Phil Crowley Steel Corp.* v. *Sharon Steel Corp.*, 782 F.2d at 784 (order of parent and subsidiary to subsidiary's subsidiary to increase its prices above those set in contracts with third party improper where purpose was to "enhance their interests in a separate . . . subsidiary").

A similar approach appears to apply in employment cases involving a parent company, i.e., to avoid liability, the parent company must demonstrate sufficient direct interest in the

employment contract interfered with. *Felsen* v. *Sol Cafe Mfg. Corp.*, 24 N.Y.2d 682 (1969), bears some similarities to the case before us. In *Felsen*, the plaintiff was an executive of a subsidiary with a written employment contract. After another company purchased the outstanding stock of the company, the plaintiff was terminated, allegedly on the ground of having submitted falsified production reports. There was evidence the jury could have believed that the charges themselves were falsified. The court therefore upheld a jury verdict for the plaintiff on a breach of contract count. However, the New York Court of Appeals reversed the jury's verdict for the plaintiff on his intentional interference claim on the ground that "the evidence tended to indicate that the officers of [the parent company] were reasonably concerned with the internal management of the . . . manufacturing plant, for which the plaintiff had general responsibility, and that this concern led them to recommend plaintiff's discharge." *Id.* at 687. The court also noted that there was no evidence that the interference was motivated by malice or that the parent used illegal means. *Ibid.* See *Griswold* v. *Heat Inc.*, 108 N.H. 119, 125 (1967) ("stockholders who have an interest in the activities of a corporation or the duty to advise or direct such activities are held immune from liability in an action for inducing the corporation to breach its contract if the predominant purpose underlying their action is the pursuit in good faith of the best interest of the corporation").

"The line between a proper inference and unwarranted conjecture [in determining legitimate corporate interest] is not easily drawn. The answer depends on the evidence in each case and on what the trier of fact may reasonably infer from that evidence." *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. at 664, quoted in *Boothby* v. *Texon*, 414 Mass. at 487 (in context of supervisor cases). Here the judge implicitly found that Analogic had no legitimate corporate purpose in terminating the plaintiff. The fact that Analogic had a majority interest in B & K's Danish parent company, without more, is not enough. There is no evidence of concern with the plaintiff's performance other than the alleged excess payments, contrast *Felsen* v. *Sol Cafe Mfg. Corp.*, 24 N.Y.2d at 687, or of any matter of direct financial interest to Analogic. While it is true that related companies are allowed considerable latitude to interfere in the contractual relations of each other, the judge's finding that Analogic's conduct in this case was beyond such boundaries is not clearly errone-

ous. Nor is it inconsistent with relevant policy considerations. The burden of showing privilege might well be greater for an entity at greater remove from the day to day operations of the employer company.

On the facts of this case, we need not determine more precisely the extent of a "grandparent" company's privilege, particularly whether a showing of maliciousness is required. See *Alba* v. *Sampson*, 44 Mass. App. Ct. at 315 (malice, also referred to as "spite or malevolence," means "a purpose unrelated to any legitimate corporate interest"). Compare Restatement (Second) of Torts, Introductory note to ch. 37, at 5 (term malicious not used in literal sense, but has come to be called "legal malice" meaning the interference is intentional and "without justification"); Prosser & Keeton, Torts § 129, at 979, 983 (5th ed. 1984) ("now clear that no actual spite . . . required and . . . term [malicious] has gradually dropped from the cases").

e. *G. L. c. 93A claim.* Aside from incorporating by reference the preceding arguments that there was no interference with the plaintiff's contract, Analogic claims that, even if it did interfere in the plaintiff's contract with B & K, its conduct was not sufficiently egregious to warrant relief under G. L. c. 93A. The trial judge thought otherwise. It was his decision to make. *G.S. Enterprises, Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. at 277 (the question of intentional interference with the contract is for the fact finder, as are related c. 93A allegations).

f. *Attorney's fees.* As the plaintiff concedes, he is not entitled to attorney's fees from B & K on the breach of contract claim. Analogic should have an opportunity to contest the plaintiff's affidavit regarding attorney's fees for the G. L. c. 93A claim. See *Hanover Ins. Co.* v. *Sutton*, 46 Mass. App. Ct. 153, 177 (1999) (effort expended on unsuccessful claims brought in concert with a successful c. 93A claim should not be compensated).

3. *Conclusion.* To the extent we have not addressed every aspect of the defendants' arguments, we have concluded no discussion is warranted. In particular, the judge having indicated that he did not credit Soshnick's testimony, the arguments based on that testimony are without merit. Nor do we consider arguments based on facts not in evidence.

The case is remanded to the Superior Court for further consideration of the plaintiff's affidavits regarding attorney's

fees. In all other respects the judgment is affirmed. Having raised the issue in his brief, the plaintiff "may . . . submit his petition for [appellate] fees together with the necessary back-up material and details as to hours spent, precise nature of the work, and fees requested," *Yorke Mgmt.* v. *Castro*, 406 Mass. 17, 20 (1989), to this court within fifteen days of the issuance of the rescript in this case.

*So ordered.*