NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

15-P-953                                          Appeals Court

ELIZABETH BENINATI & another[1] vs. STEVEN BORGHI & others[2] (and a consolidated case[3]).

No. 15-P-953.

Suffolk.      May 16, 2016. - October 24, 2016.

Present: Agnes, Massing, & Kinder, JJ.

Contract, Construction of contract, Modification. Consumer Protection Act, Availability of remedy. Practice, Civil, Attorney's fees. Damages, Attorney's fees.

---

[1] Joseph Masotta. Both plaintiffs sued individually and derivatively on behalf of Cardio Fitness Group, LLC; One Fitness Group, LLC; Too Fitness Group, LLC; Tree Fitness Group, LLC; Fore Fitness Group, LLC; V Fitness Group, LLC; SVN Fitness, LLC; Snowman Fitness Group, LLC; Nine Fitness Group, LLC; X Fitness Group, LLC; WOW Massachusetts Fitness Group, LLC; SJBB Fitness, LLC; Uno Dos Fitness, LLC; WAMP Fitness, LLC; FTN Fitness, LLC; and Fitness Capital, LLC.

[2] Linda Borghi; Harold Dixon; Blast Fitness Group, LLC; Blast Fitness Cambridge, LLC; Blast Fitness Lawrence, LLC; Blast Fitness Saugus, LLC; Blast Fitness North Providence, LLC; Blast Fitness Group Personal Training, LLC; Auburndale Fitness Group Investment, LLC; 311 Fitness, Inc.; JDM Fitness, Inc.; CapeCapital, LLC; Work Out World Foxborough, LLC; BFit Bellingham LLC; KL BFitness LLC; and TL BFitness LLC.

[3] Joseph Masotta & others vs. Steven Borghi & another.

Civil actions commenced in the Superior Court Department on May 24, 2012, and May 14, 2013.

After consolidation, the case was heard by Janet L. Sanders, J.; a motion for attorney's fees and costs was heard by her; and entry of final judgment was ordered by her.

John W. Moran (Michael T. Grant with him) for Elizabeth Beninati.
Charles R. Bennett, Jr., for Steven Borghi.
Max D. Stern for Harold Dixon & others.
Michael S. Marino, for Joseph Masotta & others, was present but did not argue.

MASSING, J.  The plaintiffs, Elizabeth Beninati and Joseph Masotta, together with defendants Steven Borghi and Linda Borghi, owned and operated a chain of fitness clubs licensing the "Work Out World" (WOW) trade name (collectively, WOW New England).[4]  While actively involved in the management of WOW New England, Steven, working with an outside partner, defendant Harold Dixon, and using WOW New England's inside information and resources, formed Blast Fitness Group, LLC (Blast), and opened a chain of similar clubs in the same geographic area, some using the WOW name, others using the name "Blast Fitness."  (We refer to the defendant clubs that Dixon and Steven controlled as the Blast clubs or, together with Blast, as the Blast defendants).

---

[4] To avoid confusion with Elizabeth's late husband Anthony Beninati, we refer to the Beninatis by their first names, Elizabeth and Tony.  We likewise refer to the Borghis by their first names, Steven and Linda.

After a jury-waived trial on two consolidated complaints,[5] a Superior Court judge found the Borghis and Dixon liable to Elizabeth, Masotta, and the other WOW New England owners for breach of fiduciary duty on the plaintiffs' derivative claims and awarded approximately $4 million in damages. The judge held as a matter of law, however, that Dixon and the Blast defendants could not be liable for unfair competition under G. L. c. 93A because their misconduct involved only aiding and abetting Steven in the breach of his fiduciary duties. The judge also upheld corporate votes of the WOW New England companies removing the Borghis from management, and awarded attorney's fees to Elizabeth under G. L. c. 156C, § 57, but not Masotta.

On Elizabeth and Masotta's appeal from the judge's ruling in favor of Dixon and the Blast defendants on the c. 93A claim, we vacate and remand for further proceedings. On Masotta's appeal from the denial of his request for reimbursement of attorney's fees and expenses, and on the Borghis' cross appeal from the enforcement of their removal, we affirm.

---

[5] Elizabeth filed a suit in the Superior Court on behalf of herself and derivatively on behalf of the WOW New England corporations, alleging numerous counts including breach of fiduciary duty, breach of contract, and violation of G. L. c. 93A, § 11. By the time of trial, Masotta, who had originally been named as a defendant, had realigned as a plaintiff with Elizabeth. Elizabeth and Masotta also filed a second complaint to enforce corporate votes removing the Borghis as managers of WOW New England, and the cases were consolidated for trial.

Background.  We state the uncontested facts as set forth in the judge's thoughtful and comprehensive memorandum of decision, based on the testimony she heard and the nearly one thousand exhibits she reviewed during a twenty-day bench trial.  We reserve some disputed factual issues for later discussion.

WOW New England began as a single club in Randolph in 1999.  Elizabeth's husband, Anthony Beninati (Tony), and Steven opened the first club, with Masotta receiving an ownership interest in exchange for doing the build-out work.  A year later, the trio opened a second club in Norwood.  Early on, they decided to license the WOW name from WOW Licensing LLC (WOW Licensing).  The licensing agreement, with a stated term of five years, specified that WOW Licensing would not grant the rights to the WOW name to any other entity within five miles of the WOW New England clubs.

Between 1999 and Tony's untimely death from a rare and apparently incurable disease in 2005, Tony, Steven, and Masotta opened ten more health clubs in New England, eight of which were still in operation at the time of trial.  Each club entered into the same licensing agreement with WOW Licensing.  Steven was responsible for scouting new locations, Masotta oversaw construction of the new clubs, and Tony ran the day-to-day business.  Steven's wife Linda took an active role in running the clubs as a salaried employee.  While Tony was alive,

Elizabeth did not actively participate in the management of the clubs.

Each club was owned and operated through a separate limited liability company, with discrete operating agreements and varying ownership percentages allocated among the three majority owners, as well as assorted minority investors. However, attention to corporate niceties was lax, and eight of the clubs were opened without written operating agreements. In December, 2004, just a month before Tony's death, WOW New England's accountant drew up written operating agreements for the eight LLCs, and an updated agreement for one of the other clubs. The eight new agreements referred to "Anthony (Elizabeth) Beninati" as one of the members. For the first time, the agreements included noncompetition clauses -- Tony, Steven, and Masotta would open new clubs either together or not at all.

After Tony's death in 2005, Elizabeth began to play an active role in the management of WOW New England. By 2006, she was signing equipment finance agreements, advertising contracts, and leases; handling personnel matters such as schedules and pay, employment policies, and approval of employees' expenditures; and helping to develop the clubs' Web site. For all major decisions, Elizabeth and Steven were equals, with Masotta casting the deciding vote on upper management decisions when the two disagreed.

For three years following Tony's death, no new clubs were opened. Then, between 2008 and 2010, four new health clubs were launched. Following the template of the original clubs, each was owned by a separate corporation and each paid an annual fee to WOW Licensing, though neither the operating nor licensing agreements were ever committed to writing. During this time, the five-year licensing agreements between the original clubs and WOW Licensing began to expire. Although the licensing agreements were never renewed in writing, both WOW Licensing and WOW New England operated as if they were still in effect -- the annual fee was paid, the name was used, and the five-mile geographic limitation was respected.

However, starting in 2010, Elizabeth, Steven, and Masotta increasingly disagreed about the direction of WOW New England. Steven, who had already opened a series of WOW-licensed clubs in Minnesota by himself, wanted greater expansion than his partners. In the fall of 2010, Steven met defendant Dixon, a businessman interested in the health club industry. In January, 2011, Steven and Dixon formed Blast Fitness Group, LLC, which, along with another Dixon-controlled entity, would ultimately come to own and operate thirteen health clubs in Massachusetts and Rhode Island, in direct competition with WOW New England.

Dixon first became involved with WOW New England as a "consultant," hired and paid personally by Steven, not by WOW

New England. Steven arranged, at Dixon's request, for Dixon to have direct access to proprietary and confidential WOW New England information such as membership data, revenue spreadsheets and projections, profit and loss statements, and performance reports, as well as employee training manuals, payroll data, vendor information, and the expertise and experience of WOW New England employees. Steven and Dixon ultimately used this information in running the Blast clubs, and many of the WOW New England staff would come to work for Blast, even while still on the WOW New England payroll.

Significantly, Linda was one of the employees who worked for both WOW New England and Blast. Although Linda was originally a salaried employee of WOW New England, the 2004 WOW operating agreements named Linda as manager. Nonetheless, she played no role in the business between 2006 and late 2010. However, after the creation of Blast she began attending meetings with Steven, Dixon, and other investors regarding the Blast clubs, and Dixon recruited her to be Blast's director of club operations. While employed at Blast, Linda remained in close contact with WOW New England employees, and upon Steven's or Dixon's request, she would obtain access to WOW New England's confidential information and provide it to Blast representatives. She returned to WOW New England after being named its chief operating officer in the fall of 2011, but

continued her relationship with Blast, funneling information from WOW New England to Blast.

When Blast was formed, neither Elizabeth nor Masotta was aware of its existence. Nor were they aware that in 2011, Steven, with Dixon's knowledge and active encouragement, negotiated and executed a separate licensing agreement between WOW Licensing and Blast, granting Blast the exclusive right to use the WOW name in New England. Although the agreement included a provision providing for payment to WOW Licensing of WOW New England's licensing fee for 2011, it superseded any agreements WOW New England had with WOW Licensing. Steven -- again with Dixon's knowledge, active encouragement, and assistance[6] -- also signed a lease for a property in Foxborough that would later become the site of a Blast club, using one of the WOW New England clubs as a guarantor. Blast continued to expand, first with a management agreement for three Gold's Gyms -- an opportunity that had first been presented to WOW New England, but that Elizabeth and Masotta had rejected. Steven and Dixon eventually changed the name of the three former Gold's Gyms to WOW, informing Elizabeth and Masotta that profits for those clubs would not be shared with WOW New England and that any agreements regarding those clubs (which copied those of WOW

---

[6] Dixon was aware, as early as 2011, that Steven had agreed not to compete with the other principals of WOW New England.

New England) were confidential and separate from WOW New England. Nonetheless, Steven arranged for the three clubs to be advertised on WOW New England's Web site.

In 2011, the parties hired attorneys to look into the brewing disputes. The parties and their attorneys began meeting in May, 2011, in an attempt to forge an agreement allowing for the continued expansion by Steven and Dixon, with Elizabeth and Masotta participating in some fashion. In addition, they worked to revise the operating agreements for the existing WOW New England clubs. After extensive negotiations, as well as a side agreement among Masotta, Dixon, and Steven, the agreements were signed by Masotta, Steven, and some of the other WOW New England minority owners -- but not Elizabeth. However, the parties made no efforts to comply with some of the more significant terms of the 2011 agreements, such as gross revenue payouts, which had been offered in exchange for abolishing the territorial restriction on competition.

In the summer of 2011, as litigation became more likely, Dixon began to take various steps to distance himself from Steven. Starting in August, 2011, Dixon decreased Steven's ownership percentage in the Blast clubs. By 2013, Steven was limited to an ownership interest in only six clubs in New England out of sixty that Blast operated nationwide. Dixon also negotiated an agreement between WOW Licensing and a Dixon-

controlled entity for exclusive use of, and sublicensing rights to, the WOW name in New England. Dixon then increased the licensing fee of the WOW New England clubs from $4,000 yearly to $4,000 monthly; Linda signed the new licensing agreement on behalf of WOW New England. Although Dixon backed off within a month, reinstating the old fee, in a new agreement Dixon gave WOW New England permission to use the WOW name, terminable with thirty days' notice.

Elizabeth filed the first of the two consolidated actions in May, 2012. The Borghis and Masotta successfully filed a motion to have their legal fees paid by one of the WOW New England entities, as provided by the operating agreements, conditioned on repayment if they were found to have breached their fiduciary duties. The cost of the litigation, and the significant, though ultimately temporary, licensing fee increase, prompted Elizabeth and Masotta to send out notices to the members of the fourteen WOW New England companies of a meeting of the corporations. At the meeting, which convened on April 2, 2013, thirteen of the fourteen companies voted to remove the Borghis as managers of WOW New England. (Steven held a majority interest in the fourteenth club.) Still, Steven maintained an ownership interest in WOW New England. The Borghis refused to acknowledge their removal, arguing that Elizabeth did not hold a voting interest in the companies.

Elizabeth and Masotta filed a second action seeking to enforce the vote.

After trial, the judge ruled that Elizabeth was a full voting member of the WOW New England companies, that the 2011 amended and restated operating agreements were void, and, on the derivative claims, that the Borghis, aided and abetted by Dixon, breached their fiduciary duties.  However, the judge found no violation of G. L. c. 93A, reasoning that the statute does not apply to internal corporate disputes.  The judge awarded WOW New England damages totaling approximately $4 million and required Dixon to pay to WOW New England until December 31, 2017, five percent of the revenue of any health club he had opened in the New England area between April 30, 2013, and July 9, 2014.  In addition, the judge enjoined the defendants from using the WOW trade name anywhere in New England or receiving any benefit of the agreement with WOW Licensing, enjoined Steven from opening or operating competing health clubs within fifty miles of any WOW New England club as long as he remains a member of WOW New England and for one year thereafter, and enjoined Dixon from opening any new health clubs in New England until January 1, 2016.  The judge also ordered WOW New England to reimburse Elizabeth for attorney's fees and litigation expenses under G. L. c. 156C, § 57, denied Masotta's request for the same, ordered the Borghis to reimburse WOW New England for attorney's

fees that were paid on their behalf during the litigation, and ordered Masotta to reimburse WOW New England for the attorney's fees he incurred while aligned as a defendant in the case.

Discussion. 1. Removal of the Borghis from management of WOW New England. The Borghis challenge the judge's determination that the members of WOW New England validly voted to remove them from their management positions. Their removal hinged on Elizabeth's status as a voting member of the corporations. The judge concluded that Elizabeth possessed a voting membership interest in ten of the WOW New England entities even though eight of the operating agreements refer to her only once, and two of the operating agreements refer only to Tony.[7]

As a threshold matter, we agree with the judge's determination that the eight operating agreements referring to "Anthony (Elizabeth) Beninati" as a member are facially ambiguous, a question of law subject to de novo review on appeal. Browning-Ferris Indus., Inc. v. Casella Waste Mgmt. of Mass., Inc., 79 Mass. App. Ct. 300, 307 (2011). "An ambiguity arises from language susceptible of different meanings in the eyes of reasonably intelligent persons." Ibid. The fact that the agreements begin by listing "Anthony (Elizabeth) Beninati"

_____

[7] The Borghis did not contest Elizabeth's status as a full voting member of the four WOW New England companies that had no written operating agreement.

as a member, but then apportion a percentage share to "Anthony Beninati" and are signed only by Anthony Beninati, creates an ambiguity regarding the meaning of the insertion of "(Elizabeth)" in the beginning.  While we must construe the agreements based on "a fair construction of the contract as a whole and not by special emphasis upon any one part," Kingstown Corp. v. Black Cat Cranberry Corp., 65 Mass. App. Ct. 154, 158 (2005) (quotation omitted), by the same token "every word is to be given force so far as practicable."  MacDonald v. Hawker, 11 Mass. App. Ct. 869, 872-873 (1981) (quotation omitted).  We do not view the insertion of "(Elizabeth)" into the list of members as meaningless.

"Once a contract is determined to be ambiguous, the court is free to look to extrinsic evidence . . . in order to give a reasonable construction in light of the intentions of the parties at the time of formation of the contract."  President & Fellows of Harvard College v. PECO Energy Co., 57 Mass. App. Ct. 888, 896 (2003).  "Any findings by the trial judge, especially upon matters of credibility, will receive usual deferential review under the 'clearly erroneous' standard of Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996)."  Browning-Ferris, 79 Mass. App. Ct. at 307-308.  "It is the appellant's burden to show that a finding of fact is clearly erroneous."  Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 509 (1997).

We discern no clear error in the judge's factual determination that the parties meant for Elizabeth to possess a voting membership, upon Tony's death, in the eight clubs governed by these operating agreements. Ample evidence was presented to establish that in anticipation of his death from a terminal illness, Tony instructed WOW New England's accountant to draft operating agreements to reflect that he held his interests jointly with Elizabeth. Steven and Masotta considered, but rejected, holding their interests jointly with their spouses. Moreover, after Tony's death, the others treated Elizabeth as a full voting member, never questioning her status until litigation appeared imminent. The judge considered conflicting evidence, such as estate tax returns treating Tony's WOW New England ownership interests as being held individually rather than jointly with Elizabeth. The judge determined, on balance, that the parties intended these agreements to reflect that Elizabeth would assume Tony's place after his death. Where differing inferences can be drawn from the evidence, and a reasonable view of the evidence supports her findings, we defer to the trial judge. Buster v. George W. Moore, Inc., 438 Mass. 635, 642-643 (2003).

The judge did not abuse her discretion in considering the hearsay statements attributed to Tony. In any civil case, "a declaration of a deceased person shall not be inadmissible in

evidence as hearsay or as private conversation between husband and wife, as the case may be, if the court finds that it was made in good faith and upon the personal knowledge of the declarant."  G. L. c. 233, § 65, as appearing in St. 1943, c. 232, § 1.  See Eastern Paper & Box Co. v. Herz Mfg. Corp., 323 Mass. 138, 144 (1948) (declarations of deceased person regarding terms of oral contract within scope of statute).  See also Mass. G. Evid. § 804(b)(5)(A) (2016).  We review the admission of such statements under the abuse of discretion standard, see Tufankjian v. Rockland Trust Co., 57 Mass. App. Ct. 173, 179 (2003), and we find no such abuse here.  The evidence was sufficient to indicate that Tony made the statements based on personal knowledge and in good faith at a time when he and his partners were memorializing the nature of their ownership interests in anticipation of Tony's death.  Indeed, Tony's statements came years before litigation was even a possibility, and he had no reason to fabricate the statements.  See ibid.

Likewise, the judge did not err in concluding that the two operating agreements that did not refer to Elizabeth were amended by the conduct of the parties to substitute Elizabeth for Tony.  Modification or waiver of the terms of a contract may be inferred from the conduct of the parties.  See Porter v. Harrington, 262 Mass. 203, 207 (1928); Cambridgeport Sav. Bank

v. Boersner, 413 Mass. 432, 439 (1992).  The judge found ample evidence in the witnesses' testimony and documentary evidence regarding these two companies that the parties treated Elizabeth as a full partner and never adhered to the provisions differentiating between voting and nonvoting membership.  See Samia v. Central Oil Co. of Worcester, 339 Mass. 101, 109 (1959) (accepting master's finding that stockholder acquired shares in partnership, in the absence of formal instrument, where the parties' business activities were "characterized by the utmost informality," and "where, to do equity among the parties, undue emphasis cannot fairly be placed upon strict compliance with corporate formalities"); Trager v. Schwartz, 345 Mass. 653, 659 (1963) (finding waiver of restrictions on stock transfer by conduct in small family corporation "conducted without overemphasis on corporate formalities").

Nor did the judge err in setting aside the amended operating agreements finalized in June, 2011, without Elizabeth's consent, stripping her of her voting membership. The judge determined that "[m]anifest justice and fairness require that this Court not recognize [the June 2011 operating agreements] as binding."  The agreements were entered into after Dixon and Steven had, among other things, formed their partnership to launch a competing business, usurped the WOW trade name, and traded on access to proprietary and other

confidential WOW New England information.  At the time the agreements were signed, Masotta was unaware of the full extent of Dixon and Steven's actions, and as the judge found, Masotta's consent to the operating agreements "was essentially paid for" by a side agreement in which he was to receive a $10,182.07 payoff.  The judge determined Steven and Masotta to have conflicts of interest disqualifying them from voting to amend the operating agreements and found that the June, 2011, amended agreements could not stand.  See JRY Corp. v. LeRoux, 18 Mass. App. Ct. 153, 167-168 (1984) (disqualifying general partner's self-serving vote as violative of fiduciary duty owed other general partners).  We discern no clear error of fact or abuse of discretion.

Accordingly, Elizabeth had the status of a full voting member when she and Masotta called the April 2, 2013, meeting of the WOW New England membership and voted to remove the Borghis as managers.  The judge did not err in enforcing the vote to remove the Borghis.[8]

---

[8] The Borghis also dispute the judge's determination of Steven's ownership interest in two of the entities, FTN Fitness (forty percent) and WAMP Fitness (forty-five percent).  The Borghis point to the companies' 2012 tax returns, prepared by Steven's accountant, showing Steven's interests as 41.25 percent and 50.25 percent, respectively.  As these two clubs did not have written operating agreements, the determination of ownership interests rested on the testimony and evidence presented at trial.  The judge's findings were consistent with the Borghis' answer to the verified complaint and Elizabeth's

2. Dixon and the Blast defendants' liability under G. L. c. 93A. "[Section] 11 of G. L. c. 93A was intended to refer to individuals acting in a business context in their dealings with other business persons and not to every commercial transaction whatsoever." Manning v. Zuckerman, 388 Mass. 8, 10 (1983), and cases cited. It provides a cause of action for those "engaged in the conduct of any trade or commerce" who suffer damages "as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice." G. L. c. 93A, § 11, as amended by St. 1986, c. 363, § 1. Although the protections provided by G. L. c. 93A, § 11, are broad, the statute is not intended "to cover employment contract disputes between employers and the employees who work in the employer's organization, []or to disputes between members of that organization arising out of the employment relationship." Manning, 388 Mass. at 12.

The plaintiffs do not challenge the judge's ruling that the Borghis could not be liable under G. L. c. 93A because the statute does not apply to intracorporate disputes. However, the plaintiffs contend that the judge erred in finding that Dixon

---

testimony; the Borghis have not shown the judge's findings to be clearly erroneous. See New England Canteen Serv., Inc. v. Ashley, 372 Mass. 671, 675 (1977); Williams v. B & K Med. Sys., Inc., 49 Mass. App. Ct. 563, 567 (2000).

and the Blast defendants[9] could not be liable under G. L. c. 93A, § 11, for the same reason, "[b]ecause any wrongdoing by Dixon is only as a result of his aiding and assisting the Borghis in breaching their fiduciary and contractual obligations that they owed WOW New England." We agree with the plaintiffs. While c. 93A is inapplicable to employee-employer disputes, Dixon and the Blast defendants were never employees of WOW New England.[10] See Peggy Lawton Kitchens, Inc. v. Hogan, 18 Mass. App. Ct. 937, 940 (1984). Moreover, our cases have explicitly rejected the suggestion that, because an employee cannot be held liable to the company under G. L. c. 93A, outsiders who participate with the employee "in a violation of his duty of loyalty" may not be liable under G. L. c. 93A. See Augat, Inc. v. Aegis, Inc., 409 Mass. 165, 172 (1991).

In Hanover Ins. Co. v. Sutton, 46 Mass. App. Ct. 153 (1999), defendant Sutton, an officer of the plaintiff corporation, helped form a competing corporation, codefendant IPI, during the course of his employment, and diverted a

---

[9] The judge's finding on this issue was brief, and mentioned only defendant Dixon. However, she specifically referenced count XXV of the complaint, which named, among other defendants, both Dixon and the Blast defendants.

[10] The trial judge found that "[a]lthough Steven Borghi did hire [Dixon] as a consultant, the evidence showed that Borghi paid him personally for any services he rendered and that whatever services he did perform were not for the benefit of WOW New England but to advance his and Borghi's own separate business interests."

corporate opportunity from his employer to IPI. The trial judge "explicitly based his conclusion that IPI had violated c. 93A on his finding that IPI had 'aided and abetted' Sutton in breaching his fiduciary duty" to the plaintiff corporation. Id. at 173. Affirming the judge's ruling on the c. 93A claim, "[w]e reject[ed] IPI's suggestion that because Sutton, as an employee of [the plaintiff], could not be liable to [the plaintiff] under G. L. c. 93A, . . . IPI, too, could not be liable under G. L. c. 93A." Id. at 174. Similarly, the Borghis' status within WOW New England does not bar the plaintiffs' c. 93A claims against Dixon and the Blast defendants. See Manning, 388 Mass. at 10 ("Section 11 provides a private cause of action to a person who is engaged in business and who suffers a loss as a result of an unfair or deceptive act or practice by another person also engaged in business") (quotation omitted).

Because the judge believed that c. 93A was inapplicable, she did not attempt to assess Dixon or the Blast defendants' culpability under the statute. Whether the defendants violated c. 93A, and whether they did so "in a wilful or knowing manner [is] a matter for the [trial] judge. . . . Ultimately, c. 93A ties liability for multiple damages to the degree of the defendant's culpability." Kattar v. Demoulas, 433 Mass. 1, 15-16 (2000). We therefore remand the matter to the judge for a determination whether Dixon and the Blast defendants violated

c. 93A and, if so, whether single or multiple damages are warranted.[11]  See Augat, Inc. v. Aegis, Inc., 417 Mass. 484, 486-487 (1994); Kattar v. Demoulas, supra.

     3.  Reimbursement of Masotta's attorney's fees under G. L. c. 156C, § 57.  "Attorneys' fees may be awarded, in the judge's discretion, to a party who has successfully brought a derivative action on behalf of a corporation."  Coggins v. New England Patriots Football Club, Inc., 406 Mass. 666, 669 (1990).  "Such 'an allowance is discretionary and not a matter of strict right.'"  Ibid., quoting from Commissioner of Ins. v. Massachusetts Acc. Co., 318 Mass. 238, 243 (1945).  A party may recover such fees only for those claims benefitting the corporation and not for direct claims benefitting the party personally.  Coggins, supra at 669.  We review decisions on requests for attorney's fees for abuse of discretion, see id. at 672, and a "judge's decision will be reversed only if it is clearly erroneous."  WHTR Real Estate Ltd. Partnership v. Venture Distrib., Inc., 63 Mass. App. Ct. 229, 235 (2005).

     The judge ordered reimbursement of Elizabeth's attorney's fees and expenses but not Masotta's.  In denying Masotta's

---

[11] We recognize the irony that Steven, as a shareholder of WOW New England, may stand to benefit from any additional damages that Dixon and the Blast defendants are required to pay. Any such inequity is a matter between erstwhile partners Steven and Dixon, and the trial judge is free to take the equities into account in fashioning any remedy under c. 93A.

request for fees, the judge found that his fees were "incurred only to prosecute direct claims or, to the extent that Masotta's counsel participated in the prosecution of the derivative claims, his participation was unnecessary."  "The amount of a reasonable attorney's fee, awarded on the basis of statutory authority, . . . is largely discretionary with the judge, who is in the best position to determine how much time was reasonably spent on a case, and the fair value of the attorney's services." Fontaine v. Ebtec Corp., 415 Mass. 309, 324 (1993). "[I]mportant considerations are the necessity of the services, the extent to which duplicate or redundant effort was involved, and the conduct of the party seeking the award of fees."  Matter of the Estate of King, 455 Mass. 796, 807 (2010).

Unlike Elizabeth's application, which specifically differentiated between the fees attributable to the derivative suit and discounted for the fees attributable to Elizabeth's direct claims, Masotta did not identify services performed solely in pursuit of the derivative suit and did not separate them from those performed on his personal behalf.  "The party seeking attorney's fees bears the burden of showing that the amount sought is reasonable."  WHTR Real Estate Ltd. Partnership, 63 Mass. App. Ct. at 235.  The judge did not abuse her discretion in finding that Masotta failed to carry that burden.

Conclusion.  So much of the judgment that ruled in favor of Dixon and the Blast defendants on the derivative claims under G. L. c. 93A is vacated, and the matter is remanded for further proceedings consistent with this opinion.  The judgment is affirmed in all other respects.

The plaintiffs' request for appellate attorney's fees is denied.

So ordered.